# United States Court of Appeals
### For the Eighth Circuit

_____

No. 13-3234

_____

United States of America

*Plaintiff - Appellee*

v.

James Earl Gunnell

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Springfield

_____

Submitted: November 13, 2014
Filed: January 12, 2015

_____

Before BYE, SHEPHERD, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

James Earl Gunnell was convicted of possessing 50 grams or more of methamphetamine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 851. The district court sentenced Gunnell to 240 months'

imprisonment. Gunnell appeals the district court's[1] denial of his motion to suppress evidence obtained during a traffic stop. Having jurisdiction to consider this appeal under 28 U.S.C. § 1291, we affirm.

## I. Background

On August 25, 2011, James Gunnell was the subject of a police investigation that led to his arrest. Gunnell was observed driving a 2000 Kawasaki motorcycle in Springfield, Missouri, by Drug Enforcement Agency (DEA) and Task Force Officers (TFOs) who had information to believe Gunnell was a multi-pound dealer of methamphetamine. TFO Justin Arnold contacted TFO Eric Hawkins and informed him of Gunnell's location. TFO Hawkins then contacted Springfield Police Department Sergeant David Meyer to ask that Sgt. Meyer be in the general surveillance area to assist if necessary. TFO Hawkins told Sgt. Meyer that Gunnell was suspected of drug-related activity and was possibly carrying a weapon. Sgt. Meyer was also instructed to "develop probable cause" to stop Gunnell in order to search his person and his motorcycle, if possible. Sgt. Meyer then contacted K-9 Officer Kyle Tjelmeland and asked him to be available in the surveillance area with his drug dog, Raider.

At approximately 2:00 p.m. the same day, Gunnell was seen leaving an apartment building with a blue bag that he placed in the right saddlebag of his motorcycle. Gunnell left the apartment complex and began driving on Walnut Street. Sgt. Meyer started following Gunnell shortly after Gunnell turned onto Walnut Street,

---

[1]The Honorable Richard E. Dorr, late United States District Judge for the Western District of Missouri, adopting the report and recommendations of the Honorable Matt J. Whitworth, United States Magistrate Judge for the Western District of Missouri.

and he paced Gunnell for approximately three quarters of a mile.[2]  Sgt. Meyer testified that Gunnell was traveling 41 or 42 miles per hour, at least 10 miles per hour over the speed limit.  Sgt. Meyer stopped Gunnell's motorcycle on Walnut Street, just before the Kansas Expressway.

Sgt. Meyer walked up to Gunnell and asked for identification.  Shortly after Gunnell was stopped, two other officers arrived to provide support.  Gunnell did not have his driver's license with him, so the officers took his information verbally and ran his name through the system to check his license and to determine whether there were any outstanding warrants for his arrest.  The officers learned that Gunnell did not have a motorcycle designation on his license and that there were no warrants for his arrest.

Sgt. Meyer questioned Gunnell about his criminal history and travel plans and asked for Gunnell's consent to search his person and motorcycle.  Gunnell declined to provide consent for either search.  Sgt. Meyer conducted a pat-down search of Gunnell and placed him in handcuffs.[3]

Officer Tjelmeland, after hearing over the police scanner that Sgt. Meyer had made the traffic stop, went with his drug dog, Raider, directly to the location of the stop.   When he arrived at the scene, Officer Tjelmeland walked Raider around the motorcycle.  Raider alerted near the right rear compartment of Gunnell's motorcycle by biting and scratching at the area where Gunnell had placed the blue bag.  Officer

---

[2]According to Sgt. Meyer: "Pacing the vehicle is not as an exact science like a radar gun or anything like that, but you basically get behind a vehicle and you travel at a speed to where you're not gaining on the vehicle and you're not losing ground on the vehicle, so you're basically going the same speed and you estimate how fast the vehicle is going."

[3]Gunnell does not assert that the fact he was placed in handcuffs affects the court's analysis regarding the length, or purpose, of the traffic stop.

Tjelmeland and Sgt. Meyer then searched the motorcycle because of Raider's alert, and Sgt. Meyer located the blue bag in the right rear saddlebag. The blue bag contained approximately one pound of methamphetamine, clear plastic baggies, and a set of digital scales. Sgt. Meyer placed Gunnell under arrest. Gunnell was charged by superseding indictment with possession of 50 grams or more of methamphetamine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A).

Gunnell filed a motion to suppress the evidence seized during the traffic stop. A hearing was held on Gunnell's motion, and the court denied the motion. Gunnell pleaded guilty, reserving his right to appeal the denial of his motion to suppress. He was sentenced to 240 months' imprisonment and 10 years' supervised release. Gunnell timely appealed.

## II. Discussion

"In reviewing the denial of a motion to suppress, we review a district court's factual determinations for clear error and its legal conclusions de novo." United States v. Ovando-Garzo, 752 F.3d 1161, 1163 (8th Cir. 2014). "We affirm unless the denial of the motion is unsupported by substantial evidence, based on an erroneous interpretation of the law, or, based on the entire record, it is clear that a mistake was made." United States v. Douglas, 744 F.3d 1065, 1068 (8th Cir. 2014) (quotation omitted).

### A.  The Traffic Stop

Gunnell contends the traffic stop initiated by Sgt. Meyer was a warrantless seizure in violation of Gunnell's constitutional rights. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Whren v. United States, 517 U.S. 806, 809–

10 (1996). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Id. at 810. But "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Id. at 813. "Once an officer has probable cause, the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant." United States v. Frasher, 632 F.3d 450, 453 (8th Cir. 2011) (quotation omitted). "Similarly, it is irrelevant that the officer would have ignored the violation but for his ulterior motive." Id.

Sgt. Meyer testified at the suppression hearing that he stopped Gunnell because he believed Gunnell had committed a traffic violation by driving at least ten miles per hour over the speed limit. The court found Sgt. Meyer, who testified he used a technique called "pacing" to estimate Gunnell's speed, was credible and therefore concluded that the traffic stop was supported by probable cause. Even if Sgt. Meyer's primary intent was to stop Gunnell in order to further a drug investigation, the traffic violation provided probable cause to support the stop, and "any ulterior motivation on [Sgt. Meyer's] part is irrelevant." Id. The district court did not err in finding the traffic stop was supported by probable cause and was not unlawfully pretextual.

## B. Detention

Gunnell argues that he was unconstitutionally detained by law enforcement while the drug dog was brought to the scene of the traffic stop.[4] As we have explained:

_____

[4]To the extent Gunnell argues his detention was unlawful because the stop itself was improper, we have already concluded the district court did not err in finding probable cause for the initial traffic stop.

[I]f a defendant is detained incident to a traffic stop, the officer does not need reasonable suspicion to continue the detention until the purpose of the traffic stop has been completed. Occupants . . . may be detained while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation. These tasks can include a computerized check of the vehicle's registration and the driver's license and criminal history, as well as the preparation of a citation or warning. The officer may also ask questions about the occupant's travel itinerary. However, once an officer finishes the tasks associated with a traffic stop, the purpose of the traffic stop is complete and further detention . . . would be unreasonable unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify further detention. Whether a detention is reasonable is a fact-intensive question which is measured in objective terms by examining the totality of the circumstances.

Ovando-Garzo, 752 F.3d at 1163–64 (internal quotation marks and citations omitted) (alteration in original); see also United States v. Bloomfield, 40 F.3d 910, 916–17 (8th Cir. 1994) ("[A] *de facto* arrest occurs when the officers' conduct is more intrusive than necessary for an investigative stop." (quotation marks omitted)).

In this case, Sgt. Meyer called K-9 Officer Tjelmeland before he initiated the traffic stop, asking Officer Tjelmeland to be ready and nearby for a possible drug sniff in the area. Shortly thereafter, Sgt. Meyer pulled over Gunnell. Before he got out of his squad car to approach Gunnell, Sgt. Meyer called dispatch to report the stop. As soon as Officer Tjelmeland heard about the stop on police radio, he went directly to the location of the stop. Officer Tjelmeland testified that it took "five minutes or less" for him to arrive at the scene.

Meanwhile, Sgt. Meyer approached Gunnell and asked him for identification. Because Gunnell did not have a physical form of identification, Sgt. Meyer verbally took his information. Sgt. Meyer testified that while another officer ran Gunnell's information, he asked Gunnell "a variety of questions that are pretty standard for

traffic stops," including where Gunnell was going and whether he had any prior arrests. Based on the information he had previously received from TFO Hawkins, he also conducted a pat down search of Gunnell. And he asked Gunnell for permission to search his person and his motorcycle. Gunnell refused both requests.

Gunnell argues that his detention was prolonged unnecessarily waiting for the drug dog to arrive for the sniff. The undisputed facts of this case, however, show otherwise. Though law enforcement may not prolong a traffic stop, and thus the traveler's detention, beyond what is necessary to complete the stop, the undisputed evidence shows that is not what happened here. In this case, the unrefuted testimony is that Officer Tjelmeland and his drug dog arrived while the officers were still conducting the traffic stop. Sgt. Meyer testified that the time it took for Officer Tjelmeland and Raider to arrive at the scene did not exceed the time it took the other officers to run Gunnell's information through the computer in the course of the traffic stop. In other words, the officers were still "complet[ing] the purpose" of the stop when Officer Tjelmeland and Raider arrived.[5] United States v. Suitt, 569 F.3d 867, 870 (8th Cir. 2009) (quotation omitted). Given the facts and timing in this case, the district court did not err in concluding that officers did not unlawfully prolong the traffic stop (and Gunnell's detention) beyond what was necessary to complete the stop.

## C. Search

Gunnell asserts Raider's alert to the presence of drugs on his motorcycle was unreliable because Officer Tjelmeland and Raider had not undergone drug detection training as a pair but, rather, received certification individually before being paired

---

[5]When expressly asked, Sgt. Meyer also stated that he did not "drag his feet" when conducting the traffic stop in order to give Officer Tjelmeland and Raider additional time to arrive at the scene.

to work in the field. "A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." Florida v. Harris, 133 S. Ct. 1050, 1055 (2013) (quotation marks, alterations, and quotation omitted). "In evaluating whether the [government] has met this practical and common-sensical standard, we have consistently looked to the totality of the circumstances." Id.

With regard to the reliability of drug dogs, "[t]he better measure of a dog's reliability . . . comes away from the field, in controlled testing environments." Harris, 133 S. Ct. at 1057. "For that reason, evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." Id. "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." Id. "The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test." Id. at 1058.

In this case, Officer Tjelmeland and Raider each underwent a 13-week training program before receiving their certifications to work as a drug-detection team. Once they were paired together in July 2011, they had additional training every Monday; and they had been working as a team in the field since that time, which was approximately six weeks prior to Gunnell's traffic stop. The government did not present records showing Raider's performance in the field, and Officer Tjelmeland did not have information about Raider's in-field performance prior to July 2011; but Officer Tjelmeland did testify that he "never had a false alert with Raider [when he] used him."

In Florida v. Harris, the Supreme Court explicitly stated that evidence of a drug-detection dog's performance in the field, or circumstances surrounding a particular alert, may sometimes be relevant to the issue of probable cause, but noted that such evidence is also susceptible to misinterpretation. 133 S. Ct. at 1057. In any event, in-field performance records are not necessary to a finding of probable cause in every case. See id. at 1058 ("If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause."). Gunnell failed to contest either the reliability of Raider's performance in a controlled testing environment or the validity of his (or Officer Tjelmeland's) certification. He also offered nothing to call into question the particular alert at issue in this case. Under such circumstances, the district court did not err in concluding Raider's alert supported a finding of probable cause to search Gunnell's motorcycle compartment.

## III. Conclusion

For the reasons above, we affirm Gunnell's conviction and sentence.

_____