Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/02/2020 09:08 AM CDT

State of Nebraska, appellee,
v. Ker L. Yang,
appellant.

___ N.W.2d ___

Filed May 26, 2020.    No. A-19-672.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Motions to Suppress: Trial: Pretrial Procedure: Appeal and Error.** When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from the trial and from the hearings on the motion to suppress.

3. **Trial: Investigative Stops: Warrantless Searches: Appeal and Error.** The ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search are reviewed de novo, and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge.

4. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

5. **Constitutional Law: Search and Seizure.** Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures.

6. **Constitutional Law: Search and Seizure: Investigative Stops: Motor Vehicles.** A traffic stop is a seizure for Fourth Amendment purposes, and therefore is accorded Fourth Amendment protections.

7. **Investigative Stops: Motor Vehicles: Police Officers and Sheriffs: Probable Cause.** A traffic violation, no matter how minor, creates probable cause to stop a driver of a vehicle.

8. **Investigative Stops: Motor Vehicles: Time.** A lawful traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of the stop, such as issuing a warning ticket.

9. ____: ____: ____. When the mission of an investigative stop is addressing a suspected traffic violation, the stop may last no longer than is necessary to effectuate that purpose and authority for the seizure thus ends when tasks tied to the traffic infraction are, or reasonably should have been, completed.

10. **Investigative Stops: Motor Vehicles: Police Officers and Sheriffs.** Beyond just determining whether to issue a traffic citation or warning, an officer's mission in a traffic stop includes ordinary inquiries incident to the traffic stop, such as checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.

11. ____: ____: ____. Once a vehicle is lawfully stopped, a law enforcement officer may conduct an investigation reasonably related in scope to the circumstances that justified the traffic stop. This investigation may include asking the driver for an operator's license and registration, requesting that the driver sit in the patrol car, and asking the driver about the purpose and destination of his or her travel. Also, the officer may run a computer check to determine whether the vehicle involved in the stop has been stolen and whether there are any outstanding warrants for any of its occupants.

12. ____: ____: ____. It is within the scope of the initial traffic stop for an officer to engage in similar routine questioning of passengers in the vehicle to verify information provided by the driver.

13. **Investigative Stops: Motor Vehicles: Police Officers and Sheriffs: Probable Cause.** In order to expand the scope of a traffic stop and continue to detain the motorist for the time necessary to deploy a drug detection dog, an officer must have a reasonable, articulable suspicion that a person in the vehicle is involved in criminal activity beyond that which initially justified the stop.

14. **Probable Cause: Words and Phrases.** Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause.

15. **Police Officers and Sheriffs: Probable Cause.** Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances.

16. **Probable Cause.** Reasonable suspicion exists on a case-by-case basis.
17. ____. Factors that would independently be consistent with innocent activities may nonetheless amount to reasonable suspicion when considered collectively.
18. **Investigative Stops: Police Officers and Sheriffs: Probable Cause.** If reasonable suspicion exists for a continued detention, the court must consider whether the detention was reasonable in the context of an investigative stop, considering both the length of the continued detention and the investigative methods employed.
19. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.
20. **Sentences.** In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.
21. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

Appeal from the District Court for Lancaster County: KEVIN R. MCMANAMAN, Judge. Affirmed.

Timothy S. Noerrlinger for appellant.

Douglas J. Peterson, Attorney General, and Jordan Osborne for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## INTRODUCTION
Following a jury trial in the Lancaster County District Court, Ker L. Yang was convicted of possession of marijuana with intent to deliver for which he was sentenced to 3 to 6 years' imprisonment. On appeal, Yang challenges the denial of

his motion to suppress related to a traffic stop and the excessiveness of his sentence. We affirm.

## BACKGROUND

### Facts Related to Traffic Stop

Nebraska State Patrol Trooper Robert Pelster was patrolling Interstate 80 in Lancaster County, Nebraska, on February 22, 2018. He was headed westbound when he saw a Ford Expedition (in which Yang and a passenger, Megan Winstead, were traveling) headed eastbound; it was traveling "right behind" a blue Toyota Tundra truck (in which Yang's father and mother were traveling). Trooper Pelster thought "for sure" that the vehicles were traveling together due to their "close proximity" and "driving behavior in and out of traffic for a short period of time." After Trooper Pelster turned around and positioned his cruiser behind the Tundra and Expedition, he "watched their driving behavior for a mile or two." Trooper Pelster did not see a front license plate on the Expedition but saw the rear of the vehicle was "Washington-plated." According to Trooper Pelster, Washington requires front and back license plates. The trooper pulled in front of the Expedition and saw a "solid sheet of ice and snow across the front" and no visible "plate bracket." Trooper Pelster also noted the Tundra was "California-plated" and told his dispatcher to "hold onto that plate and tag it to this traffic stop [he] was making on the [Expedition]." At 3:49 p.m., Trooper Pelster initiated a traffic stop of the Expedition for the apparent lack of a front license plate. The trooper caused his cruiser's in-car camera to begin to record. The Expedition pulled over.

The cruiser video shows Trooper Pelster then approached the passenger's side of the Expedition. He asked the occupants for identification, and while waiting for that information, Trooper Pelster walked to the front of the Expedition; the trooper confirmed that it did have a front license plate but it was "fully covered." Trooper Pelster returned to the

passenger's side of the Expedition and explained the reason for the traffic stop and that he had "cleaned" off the front license plate. Trooper Pelster asked whether the Expedition was "a rental" and whether there was a contract (answers inaudible); whether they were "with that blue truck in front of ya [sic]?" (Yang or Winstead responded, "No"); where the Expedition was rented (Yang or Winstead said, "Oregon"); and who rented the Expedition (answer inaudible). Trooper Pelster identified Yang, who provided a Wisconsin driver's license, as the driver. The passenger, Winstead, provided a Kentucky driver's license.

Trooper Pelster then brought Yang out to the front of the Expedition to show him the front license plate and further clean it off. Trooper Pelster brought Yang back to his cruiser to "review [Yang's] documents" and "issue him a written violation card for clear and visible plate obstruction." Once in his cruiser, the trooper opened the violation form and began to look at the rental contract. The cruiser video shows that shortly after they entered the cruiser, Trooper Pelster talked with Yang. Yang said he was with "Megan," who was "just a friend." According to Yang, they had been in Medford, Oregon, and had been "just going around" there. Yang said that he flew to Medford and that he knew some relatives there. He decided to travel back with the Expedition. Trooper Pelster asked where Winstead was from, and Yang answered, "I think Kentucky . . . I don't know though I just met her." He said he met her in Medford. Trooper Pelster again asked, "Are you with that blue truck [(the Tundra)]?" Yang insisted, "No no." Trooper Pelster responded, "You were right behind it"; Yang replied, "I was behind a lot of cars." Yang further denied it.

After that conversation, Trooper Pelster sought information over dispatch regarding the Tundra; he learned that it was registered to an individual with a last name of "Chang" from Yreka, California. When questioned, Yang denied he knew that person. Trooper Pelster then asked over dispatch for law

enforcement to look out for the Tundra. After that, Trooper Pelster resumed talking to Yang about his travel in light of the information that the Expedition and Tundra seemed to have come from the same area; Yang again denied that they were together. Trooper Pelster asked again how Yang got to Medford; Yang provided a similar answer to what he said before. Around that time, Trooper Pelster communicated over dispatch regarding a canine unit, because he knew one was nearby and asked for it to come to the scene, and regarding a search on the "triple [I]" for "two subjects" (i.e., an "Interstate Identification Index" for criminal histories on Yang and Winstead). Trooper Pelster "ran the two individuals for license checks to make sure their licenses were valid," and he also "ran criminal histories."

After Trooper Pelster requested the search on the "Interstate Identification Index," he started talking with Yang about the Expedition. From looking at the rental contract, Trooper Pelster learned that Yang was not the renter and was not on the contract. Trooper Pelster noted that the renter was "Bill Yang," whom Yang identified as his father, and that the vehicle was rented out of Medford. The cruiser video shows that Yang agreed he was present at the time his father rented the Expedition but that Yang said he did not know his father's location at the time of the stop. Trooper Pelster asked briefly about whether Yang had a criminal history and then had Yang lean forward as he asked, "you don't have anything in your waist band?" and Yang was told to "hold on."

Trooper Pelster then exited his cruiser and approached the passenger's side of the Expedition, peering through some of its windows on the way. He asked Winstead where they were coming from and what she was doing "there" (answers inaudible); Winstead agreed she was headed home. Winstead initially denied that she had just met Yang in Medford. Trooper Pelster then asked if they were traveling with the Tundra (answer inaudible); Winstead denied that, according to the trooper. However, Trooper Pelster continued to ask about the

Tundra (her answers are mostly inaudible, except for saying that she had not known "him" very long and that a male and a female were in the Tundra). Trooper Pelster recalled that Winstead initially stated "with some hesitance" that she was not with the Tundra or that they were not traveling with it, but then admitted they were traveling with the Tundra. The trooper remembered Winstead said there were two "older" people that were possibly Yang's parents, although she did not know their names. The cruiser video shows that Trooper Pelster then gave Winstead back her identification.

Trooper Pelster returned to his cruiser and continued his paperwork. The cruiser video shows he continued to communicate over dispatch whether the Tundra had been located. Shortly thereafter, he asked Yang, "Are your mom and dad in the car?" Hearing no response, Trooper Pelster asked again, "Are your mom and dad in that truck?" Yang did not respond. According to Trooper Pelster, Yang "just shut down" and would not talk to him anymore. Trooper Pelster asked his dispatcher about a canine unit; the trooper asked Yang if there was anything he needed to know because a canine was going to be brought out and Yang answered, "nothing that I know [of]." Shortly after that, a canine handler and canine arrived on the scene and the canine indicated the presence of narcotics. After the canine indicated, Trooper Pelster issued a warning for the obstructed license plate and the Expedition was searched. According to Trooper Pelster, 29 grams, or about 1 ounce, of "personal use" marijuana was found in Winstead's purse. Trooper Pelster then waited to see what transpired with the Tundra.

Another trooper was on patrol on Interstate 80 on February 22, 2018, when he was asked to look out for the Tundra. That trooper spotted the Tundra just after 4 p.m. and pulled it over for speeding. After some questioning, during which Yang's father said everything in the bed of the Tundra was his, Yang's father was issued a warning for speeding. With Yang's father's verbal consent, the Tundra was searched. According to

Trooper Pelster, the search of the bed of the Tundra revealed seven large trash bags containing "heat-sealed bags" of about 218 pounds of marijuana. Yang, Winstead, and Yang's father were arrested, and Yang's mother was released from police custody after an initial investigation was completed.

## PROCEDURAL HISTORY

In April 2018, the State charged Yang with possession of marijuana with intent to deliver. In August, Yang filed a motion to suppress evidence gathered by law enforcement as the result of his seizure, detention, and arrest. Yang alleged that the initial traffic stop on February 22 led to a "continued detention" that was unsupported by "reasonable suspicion" and a search of his vehicle in violation of the Nebraska Constitution and the 4th and 14th Amendments to the U.S. Constitution. There was a hearing on that motion (and others unrelated to this appeal). In December, the district court issued an order in which it denied Yang's motion to suppress.

Trial took place on May 6 through 8, 2019. At the outset, defense counsel made a continuing objection to "any testimony from — or opening with regard to the search of the Explorer pursuant to [Yang's] motion to suppress"; it was overruled. Trial evidence consisted of the testimony of Trooper Pelster, the trooper who pulled over the Tundra, Winstead, and Yang's father, as well as various exhibits, including cruiser videos of each traffic stop; photographs of the Expedition, the Tundra, and the seized black trash bags; and documentation about the seized marijuana. After the State rested its case in chief, the defense moved for a directed verdict. The motion was denied. The defense presented evidence and then rested. On May 8, the jury found Yang guilty of possession of marijuana with intent to deliver. The district court accepted the jury's verdict and entered judgment the same day finding Yang guilty as charged. On July 10, Yang was sentenced to 3 to 6 years' imprisonment, with 2 days' credit for time served.

Yang appeals.

## ASSIGNMENTS OF ERROR

Yang claims the district court (1) erroneously denied his motion to suppress and (2) imposed an excessive sentence.

## STANDARD OF REVIEW

[1,2] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, we apply a two-part standard of review. *State v. Shiffermiller*, 302 Neb. 245, 922 N.W.2d 763 (2019). Regarding historical facts, we review the trial court's findings for clear error. *Id*. But whether those facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination. *State v. Shiffermiller, supra*. When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from the trial and from the hearings on the motion to suppress. *Id*.

[3] The ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search are reviewed de novo, and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge. *Id.*

[4] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019).

## ANALYSIS

### Motion to Suppress

[5-7] Yang claims the district court erred by denying his motion to suppress. Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. *State v. Garcia, supra*. A traffic stop is a seizure for Fourth Amendment purposes, and therefore is accorded Fourth Amendment protections. *State v. Barbeau*, 301 Neb. 293, 917 N.W.2d 913 (2018).

Yang does not contest the validity of the initial traffic stop for the apparent lack of a front license plate which turned out to be present but obstructed, and we agree with the district court that the initial traffic stop was justified. See *id.* (traffic violation, no matter how minor, creates probable cause to stop driver of vehicle). See, also, Neb. Rev. Stat. § 60-399(2) (Reissue 2010) (requirement for display of license plates to be "plainly visible").

Yang argues, however, that the traffic stop was unlawfully extended. He contends Trooper Pelster could have issued a warning citation and "completed his stop" after the status of the Expedition and Yang's license were checked and after the "warrant check" for Yang and Winstead was completed. Brief for appellant at 8. Yang complains Trooper Pelster prolonged the stop "by speaking with other officers regarding the location of the [Tundra] and re-contacting Winstead, although [Trooper Pelster] had all the necessary information to complete the warning for the initial stop." *Id.* at 9.

[8-10] The U.S. Supreme Court has cautioned that a lawful traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of the stop, such as issuing a warning ticket. See *Rodriguez v. U.S.*, 575 U.S. 348, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015). When the mission of an investigative stop is addressing a suspected traffic violation, the stop may last no longer than is necessary to effectuate that purpose, and authority for the seizure thus ends when tasks tied to the traffic infraction are, or reasonably should have been, completed. *Id.* However, beyond just determining whether to issue a traffic citation or warning, an officer's mission in a traffic stop includes ordinary inquiries incident to the traffic stop. *Id.* Typically, such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Id.*

[11] Similarly, the Nebraska Supreme Court has long held that once a vehicle is lawfully stopped, a law enforcement

officer may conduct an investigation reasonably related in scope to the circumstances that justified the traffic stop. See *State v. Barbeau, supra*. This investigation may include asking the driver for an operator's license and registration, requesting that the driver sit in the patrol car, and asking the driver about the purpose and destination of his or her travel. *Id*. Also, the officer may run a computer check to determine whether the vehicle involved in the stop has been stolen and whether there are any outstanding warrants for any of its occupants. *Id.*

Further, the Eighth Circuit has held that if a defendant is detained incident to a traffic stop, the officer does not need reasonable suspicion to continue the detention until the purpose of the traffic stop has been completed. *U.S. v. Gunnell*, 775 F.3d 1079 (8th Cir. 2015). Occupants may be detained while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation. *Id.* These tasks can include a computerized check of the vehicle's registration and the driver's license and criminal history, as well as the preparation of a citation or warning. *Id.* The officer may also ask questions about the occupant's travel itinerary. *Id.*

After the Expedition was lawfully stopped and before any traffic citation was issued, Trooper Pelster's investigation related to the stop involved the following: viewing the obstructed front license plate, retrieving identification documents from Yang and Winstead, advising them of the reason for the stop, showing Yang the obstructed front license plate and cleaning it off, having Yang sit in his cruiser, reviewing Yang's "documents" and beginning to complete paperwork for the stop, reviewing the rental contract for the Expedition, and running a check of Yang's and Winstead's licenses and of their criminal histories. These tasks were either directly related to the reason for the traffic stop or were reasonably related in scope to that purpose. See *State v. Barbeau*, 301 Neb. 293, 917 N.W.2d 913 (2018). Further, Trooper Pelster was within the scope of the initial stop when he questioned Yang and Winstead about the purpose and destination of their travels.

See *id.* It was acceptable for Yang and Winstead to be jointly questioned about the Expedition and whether they were traveling with the Tundra, which the trooper had seen traveling in front of them. The trooper also had the authority to ask Yang individually about the same, as well as inquire about his travel companion Winstead and their travel plans.

Yang asserts that Trooper Pelster unlawfully prolonged the stop when he began to speak "with other officers regarding the location of the [Tundra]." Brief for appellant at 9. However, such an action was reasonably related to the scope of the stop because it had to do with Trooper Pelster's questions about Yang's travel and whether he was in fact traveling with the Tundra. Accordingly, once Trooper Pelster received the registration information for the Tundra, he reasonably confronted Yang with that information for further clarification of Yang's purpose and destination of travel.

[12] Yang contends Trooper Pelster further unlawfully prolonged the initial stop due to questioning Winstead individually. However, it is within the scope of the initial traffic stop for an officer to engage in "similar routine questioning of passengers in [a] vehicle to verify information provided by the driver." See *State v. Voichahoske*, 271 Neb. 64, 71, 709 N.W.2d 659, 668 (2006). See, also, *U.S. v. Sanchez*, 417 F.3d 971 (8th Cir. 2005) (officer may question passengers to verify information provided by driver). Trooper Pelster asked Winstead appropriate questions regarding her association with Yang and their travel plans. The cruiser video of the stop shows that Trooper Pelster accomplished several acceptable tasks reasonably related in scope to the initial stop within only about 12 minutes. Therefore, like the district court, we are not persuaded by Yang's argument that the initial traffic stop was impermissibly prolonged. The scope and length of the detention of Yang were extended sometime shortly after Trooper Pelster finished questioning Winstead individually and returned her license to her. At this point, the inconsistencies in the information provided to the trooper justified continued detention.

[13-16] In order to expand the scope of a traffic stop and continue to detain the motorist for the time necessary to deploy a drug detection dog, an officer must have a reasonable, articulable suspicion that a person in the vehicle is involved in criminal activity beyond that which initially justified the stop. *State v. Nelson*, 282 Neb. 767, 807 N.W.2d 769 (2011). Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause. *Id.* Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances. *Id.* Courts must determine whether reasonable suspicion exists on a case-by-case basis. *Id.*

[17] Factors that would independently be consistent with innocent activities may nonetheless amount to reasonable suspicion when considered collectively. *Id.* For example, evidence that a motorist is returning to his or her home state in a vehicle rented from another state is not inherently indicative of drug trafficking when the officer has no reason to believe the motorist's explanation is untrue. *Id.* But a court may nonetheless consider this factor when combined with other indicia that drug activity may be occurring, particularly the occupant's contradictory answers regarding his or her travel purpose and plans or an occupant's previous drug-related history. *Id.* (finding reasonable suspicion; defendant flew to California and was driving back to Missouri for short trip, his name was not listed on rental agreement for vehicle, he had criminal history—including drug-related arrest he failed to mention, and was extremely nervous). See, also, *State v. Howard*, 282 Neb. 352, 803 N.W.2d 450 (2011) (finding reasonable suspicion; among other things, defendant was in vehicle rented by third party and claimed to have been only one to drive for length of long trip but was not identified as authorized driver on rental agreement).

Travel plans described as somewhat unconventional may not necessarily be indicative of criminal activity. See *State*

*v. McGinnis*, 8 Neb. App. 1014, 608 N.W.2d 605 (2000) (unusual or suspicious travel plans may not always give rise to reasonable suspicion). But when travel plans seem unusual and are not reasonably explained, such circumstances may give rise to reasonable suspicion. See, *State v. Howard, supra* (unusual length, nature, expense, and duration of trip weighed heavily in favor of finding reasonable suspicion); *State v. Kehm*, 15 Neb. App. 199, 724 N.W.2d 88 (2006). While the Eighth Circuit has found travel originating in a location known for drug activity to be of limited value in determining reasonable suspicion, such a circumstance can contribute to a finding of reasonable suspicion where there are other existing suspicious factors of criminal activity. See, *U.S. v. Fuse*, 391 F.3d 924 (8th Cir. 2004); *U.S. v. Beck*, 140 F.3d 1129 (8th Cir. 1998).

Trooper Pelster testified during the suppression hearing that he had been a trooper since 2000 and had been twice certified in criminal interdiction. Among other training and experience, he had patrolled Interstate 80 for about 18 years and had personally made 240 interdictions resulting in arrests of about 400 people for drug-related offenses or other felonies. The record does not show any reason to question the district court's finding that Trooper Pelster's testimony was "entirely credible in all respects." With Trooper Pelster's extensive training and education in criminal interdiction in mind, we discuss the key factors supporting reasonable suspicion that Yang was involved in criminal activity unrelated to the underlying traffic offense.

Prior to stopping the Expedition, Trooper Pelster said he saw the Expedition "right behind" the Tundra and he thought "for sure" those vehicles were traveling together due to their "close proximity" and "driving behavior." He also recalled seeing the people in the Tundra were "male-female or two males maybe in their 50[']s or 60[']s." Drug traffickers use "vehicles traveling together" to transport contraband across the country. An "escort vehicle[]" may be used to travel behind a

"load vehicle" (containing contraband) to ensure that contraband reaches its destination. Escort vehicles generally do not contain contraband and are driven by people who are responsible for the "load" and recruit people to drive the "loads" for pay. Trooper Pelster indicated that drug traffickers tend to "use perceived police biases," e.g., "male/female, elderly," when choosing who will be in the load vehicles.

Further, between the time of the stop of the Expedition through the individual questioning of Winstead, Trooper Pelster learned the following: The Expedition that Yang was driving was rented by Yang's father. Yang claimed he did not know where his father was at the time of the stop. The Expedition was rented from Oregon, although Yang was from Wisconsin. Yang flew to Oregon but was making his return trip by vehicle without explanation; Trooper Pelster indicated vehicles are preferred over airplanes for transporting a large amount of marijuana. Yang referred to Winstead only as "Megan"; Yang and Winstead did not know each other's last names. Therefore, Yang and Winstead were, as the district court put it, "near stranger[s]," but traveling across the country together, and Yang offered no logical explanation for this. Yang said he had just met Winstead in Medford but, at least initially, Winstead denied that. Yang repeatedly denied traveling with the Tundra, but Winstead ultimately contradicted that, and added that Yang's parents were possibly in the Tundra. The Expedition and Tundra were both headed from about the same area near the Oregon-California border. According to Trooper Pelster, Medford (where Yang and Winstead were traveling from) is a "transportation hub," meaning an area where "large quantities of drugs are brought and stored" and then "moved" to "distribution cities . . . that are highly populated [and] consume large quantities of drugs, like Green Bay."

Although the district court also noted Yang's "nervousness and failure to answer questions," Trooper Pelster's testimony during the suppression hearing related to the nervousness of

motorists in general terms; there was no testimony in this case that Yang was nervous during the stop. Nor does the cruiser camera footage of the stop contain a concrete indication or statement related to Yang's mental state. Accordingly, we do not consider Yang being "nervous" as a factor in our analysis. With regard to the district court's finding that Yang failed to answer questions, we note that Yang stopped answering Trooper Pelster's questions near the end of the stop. Because this happened after the trooper already had reasonable suspicion to extend the scope of the stop, it is not necessary to consider Yang's refusal to answer questions when considering whether reasonable suspicion existed to extend the duration of the stop.

Yang relies on *U.S. v. Beck*, 140 F.3d 1129 (8th Cir. 1998), to support that he was unlawfully detained after the traffic stop. He points out that in *Beck*, the Eighth Circuit found the totality of the circumstances failed to generate reasonable suspicion to warrant an extended detention of the traffic stop at issue in that case. The circumstances in *Beck* included the following: The defendant's rental car, licensed in California, was rented by an absent third party; there was fast-food trash on the passenger-side floorboard; there was no visible luggage in the passenger compartment of the vehicle; the defendant had a nervous demeanor; the defendant was traveling from a drug source state to a drug demand state; and the officer did not believe the defendant's explanation for the trip. But, as the district court in this case noted, *Beck* is distinguishable. It involved an officer's need for reasonable suspicion to extend a traffic stop after the investigation related to the traffic stop had already concluded, a verbal warning had been given, and the motorist had been told he was free to leave. Here, the scope of the stop was extended after the trooper spoke with Winstead, which we have already explained was permissible, and inconsistencies arose in the information provided to the trooper. The reasonable suspicion for the extended detention arose before a warning citation was issued to Yang.

We agree with the district court that this case is more akin to *U.S. v. Ward*, 484 F.3d 1059 (8th Cir. 2007), in which a defendant likewise claimed that a traffic stop was unreasonably extended. In *Ward*, the defendant was pulled over by a trooper for a traffic violation. The trooper knew the defendant's vehicle was a rental before stopping it. The trooper retrieved the defendant's license and rental agreement and asked the defendant to accompany him to the patrol car for a warning ticket. There, the trooper asked the defendant about, among other things, his travel plans and purpose, residence, and his female passenger. Before completing the warning ticket, the trooper exited the patrol car to check the vehicle identification number and then approached and questioned the passenger. *Ward* noted that "as part of a reasonable investigation, an 'officer may also question a vehicle's passengers to verify information provided by the driver.'" *Id*. at 1061. The passenger in *Ward* gave contradictory information regarding her association to the defendant and about their travel plans. And when reasonably related questions result in inconsistent answers, such circumstances can give rise to suspicions unrelated to the traffic offense and law enforcement may broaden its inquiry to satisfy those suspicions, so long as the broadened inquiry is reasonable. See *id*.

As noted by the district court, reasonable suspicion existed no later than the moment Winstead told Trooper Pelster statements which were inconsistent with what Yang had said regarding their relation to one another and to the Tundra, especially when considered with all the other preceding suspicious circumstances listed previously. See *U.S. v. Ward, supra* (stop lawfully broadened; driver told trooper that passenger was his girlfriend and that they both loaded trailer on their vehicle while passenger denied that information). See, also, *U.S. v. Sanchez*, 417 F.3d 971 (8th Cir. 2005) (conflicting stories from passengers and driver may justify expanding scope of stop and detaining occupants); *State v. Verling*, 269 Neb. 610, 694 N.W.2d 632 (2005) (determination of inconsistent

explanations of reason for trip given by driver and passenger may justify expansion of inquiry during traffic stop; it was reasonable for officer to suspect that driver and passenger were transporting illegal drugs where they gave conflicting accounts as to why they were returning to Illinois over land instead of by air and as to where they stayed while in Arizona). Although some or all of the above-described factors may be innocent when considered individually, when viewed from the standpoint of an objectively reasonable law enforcement officer, the totality of the circumstances established a reasonable, articulable suspicion that Yang was involved in unlawful activity justifying Yang's continued detention pending arrival of the canine unit. See *State v. Nelson*, 282 Neb. 767, 807 N.W.2d 769 (2011).

[18] If reasonable suspicion exists for a continued detention, the court must consider whether the detention was reasonable in the context of an investigative stop, considering both the length of the continued detention and the investigative methods employed. *State v. Howard*, 282 Neb. 352, 803 N.W.2d 450 (2011). An investigative stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Id.* Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *Id.* Trooper Pelster used a canine sniff as an investigative method in this case, a method that is considered to be minimally intrusive. See *id.* There is no rigid time limitation on investigative stops. *Id.* From the time Trooper Pelster walked back to his cruiser after questioning Winstead individually to the time the canine sniff was completed was only about 5 minutes. The continued detention of Yang was therefore reasonable in the context of an investigative stop. See *id.*

The district court correctly denied the motion to suppress.

## EXCESSIVE SENTENCE

Yang was convicted of possession of marijuana with intent to deliver under Neb. Rev. Stat. § 28-416(1)(a) (Cum. Supp.

2018), which is a Class IIA felony pursuant to § 28-416(2)(b). See Neb. Rev. Stat. § 28-405(c)(7) [Schedule I] (Supp. 2017). A Class IIA felony is punishable by up to 20 years' imprisonment. Neb. Rev. Stat. § 28-105(1) (Cum. Supp. 2018). Yang was sentenced to 3 to 6 years' imprisonment, with 2 days' credit for time served. His sentence is within the applicable sentencing range. We will not disturb Yang's sentence absent an abuse of discretion by the district court. See *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019).

[19,20] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Garcia, supra*. In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id*.

The presentence investigation report (PSR) showed Yang was 32 years old at the time of his sentencing. He was born in Thailand and immigrated to the United States while still an infant. He was pursuing a "General Education Diploma" but denied starting testing. The PSR showed that for the year before his interview, he did two to three "construction projects" each month for cash. Yang admitted he had not held any "legitimate employment" in the year before his presentence interview. Despite this, he had been "commuting between California and Wisconsin."

Yang's criminal history includes juvenile offenses. As an adult, Yang has been charged with violating probation, felony "[b]ail [j]umping," and battery, which was amended down to a charge of disorderly conduct; the disposition of those charges was unknown. Yang also has a December 2009

conviction for battery related to a domestic abuse incident, for which he was sentenced to 18 months' probation and 20 days' jail time, and a charge of disorderly conduct that was dismissed. The circumstances of Yang's present conviction were set forth in the PSR. Yang "appeared to be engaging in minimization and denial regarding his involvement in the present offense." The PSR showed that Yang's codefendants, his father and Winstead, were charged with the same offense as Yang for the February 2018 incident; both entered pleas on reduced charges of attempted possession of marijuana with intent to deliver. Winstead was sentenced to 4 years' probation. Yang's father was sentenced to 30 months' imprisonment and 18 months' post-release supervision, with 1 day's credit for time served.

On the "Level of Service/Case Management Inventory," Yang scored "medium risk" in the domains of criminal history, family/marital, and alcohol/drug problem; "high risk" in the domains of education/employment and leisure/recreation; and "very high risk" in the domains of companions, procriminal attitude/orientation, and antisocial pattern. Overall, Yang was at a "very high risk to re-offend with a total score of 31."

During the sentencing hearing, the district court said it had reviewed the PSR. Yang's counsel pointed out that Winstead was placed on probation. Yang's counsel asked for a sentence of probation for Yang as well, arguing that it appeared that Yang's father was the "most culpable," while Yang fell "somewhere much closer to . . . Winstead." Alternatively, Yang's counsel requested a sentence less than that given to his father. Yang was given the chance to personally address the court, but he declined to do so.

The district court said it had noted Yang's age, education level, and background; his criminal record, which included "some battery and a juvenile record"; and the motivation for and the nature of the offense that appeared to be for "financial gain," noting Yang indicated he did not use "it" (marijuana) himself. The court considered that there was no violence or

minor children involved. The court said it did not seem like Yang had a "steady job" despite a "[c]laim" of doing "some construction for cash a couple of times a month." Yang was "still" going back and forth from California to Wisconsin and "claiming to do construction jobs"; "there's just not a lot forthcoming about any of that." The court was concerned with the "significant" amount of marijuana being transported in this case in disregard for Nebraska law. The court stated, "[T]hat much marijuana being transported through the state is danger-ous . . . in the wrong hands."

On appeal, Yang reiterates that Winstead was sentenced to 4 years' probation and that Yang's father was sentenced to 30 months' imprisonment. Yang argues that his codefendants appeared to be "more culpable" based on the facts at trial. Brief for appellant at 18. He says he appears to be, "at worst," similarly situated to Winstead in terms of criminal culpability. *Id.* To Yang, it is "hard to fathom why [he] received a harsher sentence than [his father]." *Id.* However, Yang did not enter a guilty plea to a reduced charge and was therefore convicted of a more significant offense than his father and Winstead. Yang was convicted of a Class IIA felony. He could have been sen-tenced to up to 20 years' imprisonment. His sentence of 3 to 6 years' imprisonment is on the low end of the sentencing range and is not an abuse of discretion.

Yang also argues that, like Winstead, he should have received a sentence of probation. While our record does not contain the circumstances of Winstead's life (beyond that related to the February 2018 offense), the PSR indicates that Yang had "multiple probation violations" on his criminal record. Further, the district court concluded from its review of the PSR that imprisonment of Yang was necessary for the protection of the public and because (1) the risk was substan-tial that during any period of probation Yang would engage in additional criminal conduct and (2) a lesser sentence would depreciate the seriousness of Yang's crimes and promote dis-respect for the law.

[21] The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019). The record establishes that after review of the PSR, the district court considered the appropriate factors in determining Yang's sentence. See *id.* (sentencing factors). The district court did not abuse its discretion in sentencing Yang.

CONCLUSION

We affirm Yang's conviction and sentence.

AFFIRMED.