Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/21/2021 08:12 AM CDT

State of Nebraska, appellee, v.
Ronda K. Thompson, appellant.

___ N.W.2d ___

Filed September 14, 2021.    No. A-20-722.

1. **Constitutional Law: Search and Seizure: Motions to Suppress:
   Appeal and Error.** In reviewing a trial court's ruling on a motion to
   suppress based on a claimed violation of the Fourth Amendment, an
   appellate court applies a two-part standard of review. Regarding histori-
   cal facts, an appellate court reviews the trial court's findings for clear
   error. But whether those facts trigger or violate Fourth Amendment
   protections is a question of law that an appellate court reviews indepen-
   dently of the trial court's determination.
2. **Convictions: Evidence: Appeal and Error.** Regardless of whether
   the evidence is direct, circumstantial, or a combination thereof, and
   regardless of whether the issue is labeled as a failure to direct a verdict,
   insufficiency of the evidence, or failure to prove a prima facie case, the
   standard is the same: In reviewing a criminal conviction, an appellate
   court does not resolve conflicts in the evidence, pass on the credibility
   of witnesses, or reweigh the evidence; such matters are for the finder
   of fact, and a conviction will be affirmed, in the absence of prejudicial
   error, if the evidence admitted at trial, viewed and construed most favor-
   ably to the State, is sufficient to support the conviction.
3. **Constitutional Law: Search and Seizure.** Both the Fourth Amendment
   to the U.S. Constitution and article I, § 7, of the Nebraska Constitution
   guarantee against unreasonable searches and seizures.
4. **Constitutional Law: Search and Seizure: Investigative Stops: Motor
   Vehicles.** A traffic stop is a seizure for Fourth Amendment purposes, and
   therefore is accorded Fourth Amendment protections.
5. **Investigative Stops: Motor Vehicles: Probable Cause.** A traffic viola-
   tion, no matter how minor, creates probable cause to stop the driver of
   a vehicle.
6. **Investigative Stops: Motor Vehicles: Police Officers and Sheriffs.**
   Once a vehicle is lawfully stopped, a law enforcement officer may

conduct an investigation reasonably related in scope to the circumstances that justified the traffic stop. This investigation may include asking the driver for an operator's license and registration, requesting that the driver sit in the patrol car, and asking the driver about the purpose and destination of his or her travel. Also, the officer may run a computer check to determine whether the vehicle involved in the stop has been stolen and whether there are any outstanding warrants for any of its occupants.

7. **Investigative Stops: Motor Vehicles: Time.** A lawful traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of the stop, such as issuing a warning ticket.

8. \_\_\_\_: \_\_\_\_: \_\_\_\_. When the mission of an investigative stop is addressing a suspected traffic violation, the stop may last no longer than is necessary to effectuate that purpose and authority for the seizure thus ends when tasks tied to the traffic infraction are, or reasonably should have been, completed.

9. **Investigative Stops: Motor Vehicles: Police Officers and Sheriffs.** An officer's inquiries into matters unrelated to the justification for the traffic stop do not cause the stop to become unlawful, so long as those inquiries do not measurably extend the duration of the stop.

10. **Constitutional Law: Police Officers and Sheriffs: Search and Seizure: Arrests.** A tier-one police-citizen encounter involves the voluntary cooperation of the citizen elicited through noncoercive questioning and does not involve any restraint of liberty of the citizen. Because tier-one encounters do not rise to the level of a seizure, they are outside the realm of Fourth Amendment protection. A tier-two police-citizen encounter involves a brief, nonintrusive detention during a frisk for weapons or preliminary questioning. A tier-three police-citizen encounter constitutes an arrest, which involves a highly intrusive or lengthy search or detention. Tier-two and tier-three police-citizen encounters are seizures sufficient to invoke the protections of the Fourth Amendment to the U.S. Constitution.

11. **Constitutional Law: Search and Seizure.** A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave.

12. \_\_\_\_: \_\_\_\_. In addition to situations where an officer directly tells a suspect that he or she is not free to go, circumstances indicative of a seizure may include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen's person, or the use of language or tone of voice indicating the compliance with the officer's request might be compelled.

13. ____: ____. A traffic stop may de-escalate from a seizure to a voluntary encounter when the circumstances become such that a reasonable person would feel free to leave or otherwise terminate the encounter with law enforcement.

14. **Constitutional Law: Search and Seizure: Evidence: Proof.** When the State asserts that evidence obtained in a search following a Fourth Amendment violation is admissible due to the defendant's consent to the search, it must prove two things: (1) The consent was voluntary, and (2) the consent was sufficiently attenuated from the violation to be purged of the primary taint.

15. **Constitutional Law: Search and Seizure.** For the consent to be attenuated from the Fourth Amendment violation, there must be a sufficient break in the causal connection between the illegal conduct and the consent to search.

16. **Constitutional Law: Search and Seizure: Evidence.** A court must consider the evidence's admissibility in the light of the Fourth Amendment's distinct policies and interests, even if a consent to search is voluntary.

17. **Constitutional Law: Search and Seizure.** The determination of whether the facts and circumstances constitute a voluntary consent to a search, satisfying the Fourth Amendment, is a question of law.

18. **Search and Seizure: Duress.** For consent to be voluntarily given, it must be a free and unconstrained choice, not the product of a will overborne, and it cannot be given as the result of duress or coercion, whether express, implied, physical, or psychological.

19. ____: ____. In determining whether consent was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents.

20. **Search and Seizure.** Mere submission to authority is insufficient to establish consent to a search.

21. ____. Although the fact that an individual is in police custody is an important consideration in determining the voluntariness of the consent to search, such factor, standing alone, does not invalidate the consent to search as long as the consent was otherwise voluntarily given.

22. ____. The determination of whether consent to a search was freely and voluntarily given is based on the totality of the circumstances.

23. **Constitutional Law: Search and Seizure: Evidence: Time.** In determining whether the causal chain leading to consent is sufficiently attenuated from a Fourth Amendment violation to allow for the admission of the evidence, a court considers three relevant factors: (1) the time elapsed between the constitutional violation and the acquisition of the evidence (temporal proximity), (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct.

24. **Search and Seizure: Police Officers and Sheriffs.** Consent to search given in very close temporal proximity to the official illegality is often a mere submission or resignation to police authority.

25. **Search and Seizure: Evidence.** If only a short period of time has passed, a court is more likely to consider the consent to search as a poisonous fruit of the illegal act.

26. **Evidence: Words and Phrases.** Intervening circumstances are intervening events of significance that render inapplicable the deterrence and judicial integrity purposes which justify excluding tainted evidence.

27. **Constitutional Law: Search and Seizure: Police Officers and Sheriffs.** In the context of consent to search, an officer's act of informing a suspect of his or her right to refuse consent may be sufficient to break the causal chain between the Fourth Amendment violation and the suspect's consent.

28. ____: ____: ____. Absent any other intervening circumstance, an officer's advisement, given shortly after a Fourth Amendment violation, that a suspect may refuse consent to a search does not weigh against exclusion, particularly when the other factors strongly favor exclusion.

29. **Search and Seizure: Evidence: Police Officers and Sheriffs.** The purpose and flagrancy of the official misconduct is the most important attenuation factor.

30. **Search and Seizure: Police Officers and Sheriffs.** Purposeful and flagrant misconduct exists when (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his or her conduct was likely unconstitutional but engaged in it nevertheless and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up.

31. ____: ____. Courts usually do not deem police misconduct as flagrant unless the illegal conduct was engaged in for the purpose of obtaining consent or the police misconduct was calculated to cause surprise or fear.

32. **Criminal Law: Evidence: New Trial: Appeal and Error.** Upon finding reversible error in a criminal trial, an appellate court must determine whether the total evidence admitted by the district court, erroneously or not, was sufficient to sustain a guilty verdict.

33. **Evidence: New Trial: Double Jeopardy: Appeal and Error.** If evidence is not sufficient to sustain a verdict after an appellate court finds reversible error, then double jeopardy forbids a remand for a new trial.

34. **Criminal Law: Intent: Words and Phrases.** In the context of a criminal statute such as Neb. Rev. Stat. § 28-416(3) (Supp. 2017), "intentionally" means willfully or purposely, and not accidentally or involuntarily.

35. **Words and Phrases.** "Knowingly" means "willfully" as distinguished from "accidentally or involuntarily." In other words, to commit an act knowingly, a defendant must be aware of what he or she is doing.
36. **Controlled Substances.** A person possesses a controlled substance when he or she knows of the nature or character of the substance and of its presence and has dominion or control over it.

Appeal from the District Court for Gage County: Ricky A. Schreiner, Judge. Reversed and remanded for a new trial.

Lee Timan, of Nelson, Clark & Timan, P.C., for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.

Pirtle, Chief Judge, and Moore and Bishop, Judges.

Bishop, Judge.

## I. INTRODUCTION

Following a stipulated bench trial in the Gage County District Court, Ronda K. Thompson was convicted of possession of methamphetamine, for which she was sentenced to 24 months' probation. On appeal, Thompson challenges the denial of her motion to suppress related to a traffic stop, the admission of evidence from that traffic stop over her objection at trial, and the sufficiency of the evidence supporting her conviction. We conclude the district court erred in overruling Thompson's motion to suppress and admitting the evidence derived from the traffic stop. Accordingly, we reverse Thompson's conviction and remand the cause for a new trial.

## II. BACKGROUND

### 1. Facts Related to Traffic Stop

On September 2, 2019, at around 10 a.m., Officer Derrick Hosick of the Beatrice Police Department was on patrol in Beatrice, Nebraska. He observed a vehicle fail to stop at a stop sign and initiated a traffic stop. Thompson was the driver of the vehicle and its sole occupant. She was traveling with

her dog. As Officer Hosick exited his cruiser and approached Thompson's vehicle, he switched on his body camera.

The body camera footage shows Officer Hosick approach the driver's-side door of Thompson's vehicle. Thompson's window was rolled down. Officer Hosick advised Thompson of the nature of the stop and asked for her driver's license and vehicle registration. After handing him her documents, Thompson explained that she was aware her license plates had expired. Officer Hosick then returned to his cruiser to conduct a records check and print out the citation, having determined to give a warning for Thompson's failure to stop and a citation for the expired registration. According to the footage, the foregoing took approximately 10 minutes.

At about the 10-minute mark in the recording, Officer Hosick left his cruiser and again approached Thompson's vehicle on the driver's side. The driver's-side door was ajar, and Officer Hosick opened the door further to speak with Thompson, stepping between the open door and Thompson, who remained in the driver's seat. He prepared the citation standing next to Thompson's vehicle while reviewing the information in her documents. He explained that he decided to issue a formal citation for the expired registration and give her a verbal warning regarding the failure to stop. Officer Hosick continued to explain the options available to Thompson in handling that citation. Thompson then held the signed citation out for Officer Hosick to take.

As Officer Hosick retrieved the signed citation, he said to Thompson, "Okay, I'll get you your stuff back so you can get out of here." While putting Thompson's copy of the citation together with her documents still in his possession, he asked Thompson, "Nothing illegal in the car?" Thompson immediately answered, "No." Officer Hosick followed up by asking, "Nothing that a drug dog would indicate on or anything like that?" Thompson again answered, "No." Officer Hosick then handed Thompson her documents and her copy of the citation. At this time, he was still positioned within the threshold of

the open driver's-side door of Thompson's vehicle. As he was handing Thompson her documents, he asked her, "Do you have any problems if I look in your car to make sure there's nothing illegal in the car?" Thompson replied, "No, go ahead. Help yourself." Officer Hosick then said, "Would you want to hold on to the pup for me?" Thompson indicated that she told her dog she had done a good job of not barking. Thompson then asked, "You want us to get out or anything?" Officer Hosick responded, "Would you please," and he then turned and walked back toward his cruiser, but stopped short and turned around as Thompson began to exit her vehicle.

Thompson directed her dog to stay "on the green," and then she unlocked the doors to her vehicle. Standing next to Thompson, Officer Hosick asked, "Do you have anything in your pockets or anything like that?" Thompson answered, "No." Officer Hosick then asked her, "Would you turn out your pockets for me?" Thompson immediately proceeded to do so.

Thompson pulled a small plastic baggie out of her pocket and, upon seeing it, declared, "That is so not mine." The baggie had a crystalline residue inside, and upon further questioning from Officer Hosick, Thompson stated that she had put an antihistamine tablet in the baggie "to dissolve it." She further explained that she had "picked up the baggie from somewhere else," describing that she had picked it up "out of the trash, . . . boxes, dumpster, whatever."

After taking the baggie from Thompson, Officer Hosick called a female officer to the scene to conduct a more thorough search of Thompson's person. After the female officer arrived and began to search Thompson, Officer Hosick conducted a search of Thompson's vehicle. No further contraband was found during these searches of Thompson's person and her vehicle. Officer Hosick thereafter conducted a field test of the residue in the baggie, and the residue tested positive for methamphetamine. He then placed Thompson under arrest. Later, as he was preparing to transport Thompson to jail, Officer Hosick asked her if she had any other contraband on

her person. In response, she produced a red straw with a small amount of white residue inside of it. The baggie and straw were subsequently sent to the Nebraska State Patrol Crime Laboratory, and the baggie tested positive for methamphetamine after laboratory analysis. No analysis was conducted on the straw.

## 2. Procedural History

Thompson was charged with possession of a controlled substance, methamphetamine. On December 28, 2019, she filed a motion to suppress "any and all physical evidence obtained as a result from the law enforcement search" of her person. She alleged the traffic stop extended "beyond that which was necessary for Officer Hosick to complete his investigation into the No Valid Registration issue" and that her continued detention was not supported by probable cause or reasonable suspicion, all in violation of the Nebraska Constitution and the 4th and 14th Amendments to the U.S. Constitution. There was a hearing on Thompson's motion, and on March 24, 2020, the district court issued an order overruling the motion to suppress. The court concluded that "Officer Hosick's request to search [Thompson's] person at the conclusion of the traffic stop was not an unreasonable search or seizure, because [she] knowingly, voluntarily and intelligently consented to a search of her person."

The district court held a stipulated bench trial submitted on stipulated facts. Thompson objected to the admission of the evidence acquired from the traffic stop, and the court overruled the objection. The court found Thompson guilty and sentenced her to 24 months' probation. Thompson now appeals.

## III. ASSIGNMENTS OF ERROR

On appeal, Thompson claims the district court erred in overruling her motion to suppress and overruling her objection to the admission of evidence presented by the State. She also claims the evidence was insufficient to support her conviction.

## IV. STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, we apply a two-part standard of review. *State v. Shiffermiller*, 302 Neb. 245, 922 N.W.2d 763 (2019). Regarding historical facts, we review the trial court's findings for clear error. *Id.* But whether those facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination. *State v. Shiffermiller, supra*.

[2] Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Price*, 306 Neb. 38, 944 N.W.2d 279 (2020).

## V. ANALYSIS

### 1. Motion to Suppress and Admission of Evidence Derived From Traffic Stop

[3] Thompson claims the district court erred by denying her motion to suppress and admitting the evidence acquired from the traffic stop. Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019).

### (a) Initial Traffic Stop

[4,5] A traffic stop is a seizure for Fourth Amendment purposes, and therefore is accorded Fourth Amendment protections. *State v. Barbeau*, 301 Neb. 293, 917 N.W.2d 913

(2018). Thompson does not contest the validity of the initial traffic stop for her failure to stop, and we find no impropriety regarding that initial traffic stop. See *id.* (traffic violation, no matter how minor, creates probable cause to stop driver of vehicle).

### (b) Inquiries Into Presence of Contraband and Request for Consent to Search of Vehicle

Thompson asserts that "[t]he ultimate issue for this [c]ourt to determine is whether or not the further inquiry by Officer Hosick . . . should be seen as an extension of the initial [traffic stop] or [as] a voluntary encounter occurring between Officer Hosick and [Thompson]." Brief for appellant at 6. We proceed to examine the traffic stop and Officer Hosick's inquiries through the lens of applicable case law.

### *(i) Extension of Traffic Stop*

[6] Once a vehicle is lawfully stopped, a law enforcement officer may conduct an investigation reasonably related in scope to the circumstances that justified the traffic stop. *State v. Barbeau, supra*. This investigation may include asking the driver for an operator's license and registration, requesting that the driver sit in the patrol car, and asking the driver about the purpose and destination of his or her travel. *Id.* Also, the officer may run a computer check to determine whether the vehicle involved in the stop has been stolen and whether there are any outstanding warrants for any of its occupants. *Id.*

[7-9] However, the U.S. Supreme Court has cautioned that a lawful traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of the stop, such as issuing a citation. See *Rodriguez v. U.S.*, 575 U.S. 348, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015). When the mission of an investigative stop is addressing a suspected traffic violation, the stop may last no longer than is necessary to effectuate that purpose. See *id.* Authority for the seizure thus ends when tasks tied to the traffic infraction are, or reasonably

should have been, completed. *Id.* However, an officer's inquiries into matters unrelated to the justification for the traffic stop do not cause the stop to become unlawful, so long as those inquiries do not measurably extend the duration of the stop. See *Arizona v. Johnson*, 555 U.S. 323, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009). See, also, *Rodriguez v. U.S., supra* (officer may conduct certain unrelated checks during otherwise lawful traffic stop, but may not do so in way that prolongs stop absent reasonable suspicion).

As we set forth previously, the body camera footage shows that Officer Hosick, while standing within the threshold of the driver's-side door of Thompson's vehicle, asked Thompson if there was anything "illegal" or that "a drug dog would indicate on" in her vehicle as he was in the process of gathering Thompson's copy of the signed citation together with her other documents. The footage then shows he asked Thompson as he was handing those documents back to her if she would "have any problems if [he] look[ed] in [her] car." With her documents in hand, Thompson responded, "No, go ahead. Help yourself." Officer Hosick then asked Thompson "to hold on to the pup for [him]." Thompson made a comment about her dog doing a good job of not barking, and while Officer Hosick continued to stand inside the threshold of her door, she asked, "You want us to get out or anything?" Officer Hosick then replied affirmatively and stepped away from Thompson's vehicle. Thompson thereafter exited her vehicle.

We initially note there is no dispute Officer Hosick's questions concerning the presence of illegal drugs and request for consent to search were unrelated to the purpose of the traffic stop. The State does not argue on appeal that Officer Hosick had reasonable suspicion or probable cause that any contraband was present in Thompson's vehicle or on her person. Our review of the record likewise does not indicate such reasonable suspicion or probable cause existed to otherwise justify Officer Hosick's extension of the traffic stop and subsequent inquiries.

On appeal, we review the trial court's findings of fact for clear error, but we reach an independent legal conclusion as to whether those facts trigger or violate Fourth Amendment protections. See *State v. Saitta*, 306 Neb. 499, 945 N.W.2d 888 (2020). We find no clear error in the district court's factual findings concerning the course of events during the traffic stop. However, we conclude that these facts amounted to a violation of the protections provided by the Fourth Amendment. The purpose of the traffic stop had been effectuated prior to Officer Hosick's inquiries into the presence of anything "illegal" or that "a drug dog would indicate on." By that point, Officer Hosick had completed all necessary paperwork for Thompson to continue on her way and fully explained Thompson's options in handling the citation. He further had just finished advising Thompson that he would give her "stuff back so [she] can get out of here." However, despite handing Thompson her documents and thereby completing the traffic stop's purpose, Officer Hosick continued to stand inside the threshold of the open driver's-side door of Thompson's vehicle and asked additional questions regarding contraband and if he could "look in [her] car." Officer Hosick lacked authority to subject Thompson to further questioning after the completion of the paperwork necessary to effectuate the purpose of the traffic stop. See *Rodriguez v. U.S.*, 575 U.S. 348, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015) (authority for seizure ends when tasks tied to traffic infraction are, or reasonably should have been, completed). As a result, in the absence of any de-escalation to a voluntary encounter, Officer Hosick's inquiries impermissibly extended the duration of the traffic stop.

### (ii) De-escalation of Traffic Stop
### to Voluntary Encounter

Having concluded that justification for the traffic stop ended before Officer Hosick's additional inquiries, we must now determine whether or not the traffic stop had de-escalated

to a voluntary encounter at the time of Officer Hosick's questions.

[10] There are three tiers of police encounters under Nebraska law. A tier-one police-citizen encounter involves the voluntary cooperation of the citizen elicited through noncoercive questioning and does not involve any restraint of liberty of the citizen. *State v. Hartzell*, 304 Neb. 82, 933 N.W.2d 441 (2019). Because tier-one encounters do not rise to the level of a seizure, they are outside the realm of Fourth Amendment protection. *State v. Hartzell, supra*. A tier-two police-citizen encounter involves a brief, nonintrusive detention during a frisk for weapons or preliminary questioning. *Id.* A tier-three police-citizen encounter constitutes an arrest, which involves a highly intrusive or lengthy search or detention. *Id.* Tier-two and tier-three police-citizen encounters are seizures sufficient to invoke the protections of the Fourth Amendment to the U.S. Constitution. *State v. Hartzell, supra*.

[11-13] A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave. *State v. Schriner*, 303 Neb. 476, 929 N.W.2d 514 (2019). In addition to situations where an officer directly tells a suspect that he or she is not free to go, circumstances indicative of a seizure may include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen's person, or the use of language or tone of voice indicating the compliance with the officer's request might be compelled. *Id.* A traffic stop may de-escalate from a seizure to a voluntary encounter when the circumstances become such that a reasonable person would feel free to leave or otherwise terminate the encounter with law enforcement. See *State v. Hartzell, supra*.

In support of her argument that no de-escalation occurred, Thompson cites to the Nebraska Supreme Court's decision in *State v. Hartzell, supra*, and its examination therein of the

Utah Supreme Court's decision in *State v. Hansen*, 63 P.3d 650 (Utah 2002).

In *State v. Hartzell, supra*, the Nebraska Supreme Court addressed the question of whether a traffic stop had terminated and de-escalated to a voluntary encounter when, after returning the defendant's documents and walking away from the defendant's vehicle back toward her cruiser, the police officer reapproached the defendant's vehicle and asked if the defendant would be willing to talk further. In examining the encounter, the Supreme Court looked to *State v. Hansen, supra*, as a point of factual comparison and observed:

> Hartzell relies upon *State v. Hansen*[*, supra*,] for a similar factual scenario. The officer conducted a traffic stop of the defendant's vehicle for an improper lane change and uninsured vehicle. When the officer returned to the defendant, a second officer arrived and activated his patrol vehicle's lights. The officer gave the defendant a verbal warning for being uninsured but did not give a warning about the improper lane change. Once the officer returned the defendant's documents, he asked whether there was any contraband in the vehicle. The defendant denied. The officer then asked for consent to search the vehicle, and the defendant consented.

> In *Hansen*, the Utah Supreme Court reasoned that there was no evidence of de-escalation. It considered the factors concerning whether a seizure has occurred. It discussed that because there were no facts demonstrating a coercive show of authority in the initial stop, "a reasonable person would not be able to discern that a seizure had de-escalated to a consensual encounter due to the absence of such factors at the time of additional questioning." It reasoned that when the second officer arrived with his vehicle's lights flashing, a reasonable person may believe that the encounter was escalating rather than de-escalating. It discussed that when the officer returned the defendant's documents and questioned him about

contraband, the officer did not address the improper lane change, tell him he did not have to answer, or tell him he was free to leave. Under the totality of the circumstances, the court concluded that the detention did not de-escalate and that therefore, the officer exceeded the scope of the stop without reasonable suspicion.

*State v. Hartzell*, 304 Neb. 82, 91-92, 933 N.W.2d 441, 449 (2019). Contrasting the facts of *State v. Hansen, supra*, with the facts before it, the Nebraska Supreme Court determined the traffic stop had ended when the officer "returned Hartzell's documents," "told her to '"have a good night and to drive careful[ly],"'" and "walked away from the encounter." *State v. Hartzell*, 304 Neb. at 92, 933 N.W.2d at 449. The court then concluded that when the officer returned and began to ask Hartzell further questions, the encounter became voluntary because

[f]irst, [the officer] did not show coercive authority. Upon reapproaching Hartzell, [the officer] did not use an authoritative tone, brandish her weapon, or touch Hartzell. Although these factors were not present in the initial encounter, the second encounter did not begin under the guise of the initial encounter. The termination of the prior encounter signaled the start of a new encounter. Additionally, until Hartzell gave consent to search, there was only one officer present. There was no evidence of coercive authority to escalate the voluntary encounter to a seizure.

Second, [the officer] did not require compliance with her request. [The officer] asked, "'[H]ey, before you go, do you have a minute to talk to me?'" The question was casual, not authoritative. The question did not demand compliance; it simply asked for a willingness to consent.

Third, the continued flashing of the patrol vehicle's lights does not dictate a different outcome. Hartzell emphasizes that the lights were not extinguished at the point when [the officer] began to return to her patrol

vehicle. But Hartzell was aware that the patrol vehicle's lights were activated for the initial encounter, and "[Hartzell] knew [the officer] had not been back to her unit to turn [the patrol vehicle's lights] off." [The officer's] requests contradicted the notion that the flashing lights continued to command Hartzell's presence. And as we reasoned in *State v. Gilliam*, [292 Neb. 770, 874 N.W.2d 48 (2016),] patrol vehicle lights alone would not cause a reasonable person to believe that he or she was not free to leave.

*State v. Hartzell*, 304 Neb. at 93, 933 N.W.2d at 449-50.

The circumstances before us do not indicate that the traffic stop had de-escalated into a voluntary encounter by the time Officer Hosick inquired into the presence of contraband and asked Thompson if she would "have any problems if [he] look[ed] in [her] car." We note, in contrast to the facts set forth in *State v. Hartzell, supra*, there was no clear temporal divide between Officer Hosick's completion of the purpose of the stop and his further questions. Additionally, Officer Hosick's inquiries into the presence of contraband came as he remained standing inside the threshold of the open driver's-side door of Thompson's vehicle. His presence in that location would serve to physically impede Thompson from terminating the encounter and continuing on her way after the effective completion of the traffic stop's purpose. While Officer Hosick did not expressly require Thompson to remain and answer his questions, we do not observe any change in Officer Hosick's tone or conduct throughout the encounter that would indicate to Thompson that her answering Officer Hosick's questions and compliance with his request would not be required as part of the traffic stop.

Based on the totality of the circumstances, we conclude that the traffic stop did not de-escalate to a voluntary encounter, as a reasonable person in this situation would not believe that he or she was free to leave. We therefore find that Officer Hosick's further inquiries exceeded the permissible scope of the traffic

stop without reasonable suspicion or de-escalation of the stop to a voluntary encounter. Our inquiry does not end here, however, as we must next consider whether this Fourth Amendment violation necessarily requires exclusion of the subsequently obtained evidence in light of Thompson's consent.

### (c) Admissibility of Evidence Acquired Following Thompson's Consent

[14-16] When the State asserts that evidence obtained in a search following a Fourth Amendment violation is admissible due to the defendant's consent to the search, it must prove two things: (1) The consent was voluntary, and (2) the consent was sufficiently attenuated from the violation to be purged of the primary taint. *State v. Bray*, 297 Neb. 916, 902 N.W.2d 98 (2017). For the consent to be attenuated from the Fourth Amendment violation, there must be a sufficient break in the causal connection between the illegal conduct and the consent to search. See *State v. Bond*, 23 Neb. App. 916, 877 N.W.2d 254 (2016). A court must consider the evidence's admissibility in the light of the Fourth Amendment's distinct policies and interests, even if a consent to search is voluntary. *State v. Bray, supra*.

### (i) Voluntariness of Thompson's Consent to Officer Hosick's Requests

While Thompson does not claim that she involuntarily consented to Officer Hosick's requests to search her vehicle and person, we nonetheless proceed as part of our attenuation analysis to assess whether such consent was voluntary in light of the totality of the circumstances.

[17-22] The determination of whether the facts and circumstances constitute a voluntary consent to a search, satisfying the Fourth Amendment, is a question of law. *State v. Degarmo*, 305 Neb. 680, 942 N.W.2d 217 (2020). For consent to be voluntarily given, it must be a free and unconstrained choice, not the product of a will overborne, and it cannot be given as the result of duress or coercion, whether express, implied,

physical, or psychological. *State v. Bray, supra*. In determining whether consent was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents. *State v. Howell*, 26 Neb. App. 842, 924 N.W.2d 349 (2019). Mere submission to authority is insufficient to establish consent to a search. *Id.* Although the fact that an individual is in police custody is an important consideration in determining the voluntariness of the consent to search, such factor, standing alone, does not invalidate the consent to search as long as the consent was otherwise voluntarily given. *State v. Pope*, 239 Neb. 1009, 480 N.W.2d 169 (1992). See, also, *State v. Degarmo, supra*. The determination of whether consent to search was freely and voluntarily given is based on the totality of the circumstances. *State v. Bray, supra*.

At the time Officer Hosick asked to "look in" Thompson's vehicle after handing back her documents, the driver's-side door of Thompson's vehicle remained open, and Officer Hosick continued standing inside the threshold of the open door as he spoke with Thompson. His tone was not authoritative or threatening, and we observe no signs that Thompson was threatened, coerced, or otherwise under duress when she consented to Officer Hosick's request to "look in" her vehicle. After Officer Hosick asked Thompson to "hold on to the pup" for him, Thompson asked Officer Hosick, "You want us to get out or anything?" When he responded in the affirmative, she began to exit the vehicle as Officer Hosick moved away from the open driver's-side door. After stepping outside, Thompson unlocked all doors to her vehicle. We are mindful that Officer Hosick's position within the threshold of the open driver's-side door of Thompson's vehicle would physically impede Thompson from terminating the encounter until he moved away from the door. While this physical impediment shares similarities to the impediments imposed by police custody, we find that, in light of the circumstances, Thompson's consent to Officer Hosick's request to search her vehicle was voluntarily given and not the result of coercion or duress.

After Thompson had stepped out of and unlocked her vehicle, Officer Hosick asked whether Thompson had "anything in [her] pockets or anything like that." Thompson responded negatively, and Officer Hosick then requested that Thompson "turn out [her] pockets for [him]." Thompson did not verbally respond; she instead immediately reached into her pockets and withdrew a baggie containing residue that later tested positive for methamphetamine. We note that the Nebraska Supreme Court has held that consent to search may be implied by action rather than words. See *State v. Saitta*, 306 Neb. 499, 945 N.W.2d 888 (2020). Therefore, we similarly conclude that Thompson's act of pulling the baggie from her pocket was an act of voluntary consent to Officer Hosick's request and not the result of coercion or duress.

Having determined that Thompson's consent in both instances was voluntary, we must also consider whether the consent was sufficiently attenuated from the Fourth Amendment violation to be purged of that primary taint in order to make the evidence obtained admissible. See *State v. Bray*, 297 Neb. 916, 902 N.W.2d 98 (2017).

### (ii) Attenuation of Thompson's Consent From Illegal Extension of Traffic Stop

[23] In determining whether the causal chain leading to consent is sufficiently attenuated from a Fourth Amendment violation to allow for the admission of evidence, we consider three relevant factors: (1) the time elapsed between the constitutional violation and the acquisition of the evidence (temporal proximity), (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. *State v. Bray, supra*. All relevant facts should be considered to determine whether, under all the circumstances presented, the consent was obtained by exploitation of the prior illegality. *Id.*

[24,25] Consent to search given in very close temporal proximity to the official illegality is often a mere submission or resignation to police authority. *In re Interest of Ashley W.*, 284 Neb. 424, 821 N.W.2d 706 (2012). See, also, *State v.*

*Gorup*, 279 Neb. 841, 782 N.W.2d 16 (2010). If only a short period of time has passed, a court is more likely to consider the consent or statement as a "poisonous fruit" of the illegal act. See *State v. Gorup, supra*. Thompson's consent to the search of her vehicle came immediately after Officer Hosick illegally extended the traffic stop after the completion of the stop's purpose. Her act of turning out her pockets per Officer Hosick's request followed shortly thereafter. In consideration of the timeline of the traffic stop, this factor weighs against attenuation.

[26-28] Intervening circumstances are intervening events of significance that render inapplicable the deterrence and judical integrity purposes which justify excluding tainted evidence. *In re Interest of Ashley W., supra*. In the context of consent to search, an officer's act of informing a suspect of his or her right to refuse consent may be sufficient to break the causal chain between the Fourth Amendment violation and the suspect's consent. See *State v. Gorup, supra*. However, absent any other intervening circumstance, an officer's advisement, given shortly after a Fourth Amendment violation, that a suspect may refuse consent to a search does not weigh against exclusion, particularly when the other factors strongly favor exclusion. *State v. Gorup, supra*. Our review of the record does not show Officer Hosick ever advised Thompson prior to or after his additional inquiries that she could refuse consent to a search of her vehicle or of her person. We further do not observe any other intervening circumstances occurring between the illegal extension of the traffic stop and Thompson's consent to Officer Hosick's requests. This factor also weighs against attenuation.

[29-31] We turn now to examine the purpose and flagrancy of the misconduct. The purpose and flagrancy of the official misconduct is the most important attenuation factor, as it bears most heavily on the deterrence principle underlying the exclusionary rule. See *State v. Bray*, 297 Neb. 916, 902 N.W.2d 98 (2017). Purposeful and flagrant misconduct exists when

(1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his or her conduct was likely unconstitutional but engaged in it nevertheless and (2) the misconduct was investigatory in design and purpose and executed ""'"in the hope that something might turn up."'" *Id.* at 935, 902 N.W.2d at 113. Courts usually do not deem police misconduct as "flagrant" unless the illegal conduct was engaged in for the purpose of obtaining consent or the police misconduct was calculated to cause surprise or fear. *Id.* See, also, *State v. Gorup, supra* (noting other courts have stated that purposeful and flagrant conduct includes fishing expeditions in hope that something might turn up). Officer Hosick's request for Thompson's consent to search her vehicle was certainly investigatory in design and purpose without any supporting justification for such an inquiry. The same is also true of his request for Thompson to turn out her pockets. Given there was no reasonable suspicion of unlawful activity afoot, or any concern for officer safety, Officer Hosick's requests can only be considered a "fishing expedition," which courts have deemed as purposeful and flagrant conduct. See *State v. Gorup, supra*. Based upon the record before us, this factor also weighs against attenuation.

In light of the totality of the circumstances, we find that Thompson's consent to the search of her vehicle and her act of turning out her pockets in response to Officer Hosick's request were not attenuated from the illegal extension of the traffic stop. The extreme temporal proximity between the illegal extension of the stop and Thompson's consent to his requests, coupled with the lack of intervening circumstances and Officer Hosick's purposeful and flagrant conduct, indicate to us that the causal chain between Officer Hosick's conduct and Thompson's consent to his requests was not broken. As a result, we find that the district court erred in overruling Thompson's motion to suppress and admitting at trial the evidence seized from Thompson's person during the traffic stop.

## 2. Double Jeopardy and
### Sufficiency of Evidence

[32,33] Having found reversible error concerning Thompson's motion to suppress and the admission of the evidence derived from the traffic stop, we must determine whether the evidence admitted by the district court was sufficient to sustain Thompson's conviction. Upon finding reversible error in a criminal trial, an appellate court must determine whether the total evidence admitted by the district court, erroneously or not, was sufficient to sustain a guilty verdict. *State v. Draper*, 289 Neb. 777, 857 N.W.2d 334 (2015). If it was not, then double jeopardy forbids a remand for a new trial. *Id.*

[34-36] As relevant to this case, pursuant to Neb. Rev. Stat. § 28-416(3) (Cum. Supp. 2018), it is unlawful to knowingly or intentionally possess a controlled substance. Methamphetamine is a controlled substance. See Neb. Rev. Stat. § 28-405(c)(3) [Schedule II] (Cum. Supp. 2018). In the context of a criminal statute, "intentionally" means willfully or purposely, and not accidentally or involuntarily. See *State v. Erpelding*, 292 Neb. 351, 874 N.W.2d 265 (2015). "Knowingly" means "willfully" as distinguished from "accidentally or involuntarily." *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998). In other words, to commit an act knowingly, a defendant must be aware of what he or she is doing. *Id.* A person possesses a controlled substance when he or she knows of the nature or character of the substance and of its presence and has dominion or control over it. *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017).

As noted previously, our review of whether double jeopardy forbids the remand of this cause for a new trial requires that we consider the evidence admitted at trial regardless of whether it was error for the district court to do so. See *State v. Draper, supra*. There is no dispute Thompson had on her person the baggie with a residue inside that subsequently tested positive for methamphetamine. When she withdrew the baggie from her pocket, Thompson denied the baggie was hers and said,

"That is so not mine." Upon further questioning from Officer Hosick, Thompson stated that she had put an antihistamine tablet in the baggie "to dissolve it." She later explained that she picked the baggie up "out of the trash, . . . boxes, dumpster, whatever." We conclude that Thompson's initial denial and subsequent conflicting explanations, coupled with her possession of the baggie on her person, were sufficient to sustain Thompson's conviction for possession of methamphetamine. Double jeopardy therefore does not preclude a new trial.

## VI. CONCLUSION

For the reasons set forth above, we reverse Thompson's conviction and remand the cause to the district court for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.