Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/21/2023 10:09 AM CST

State of Nebraska, appellee, v.
Alexis M. Murillo-Godoy, appellant.

___ N.W.2d ___

Filed November 14, 2023.    No. A-22-909.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Constitutional Law: Search and Seizure.** Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures.

3. **Search and Seizure: Evidence: Trial.** Evidence obtained as the fruit of an illegal search or seizure is inadmissible in a state prosecution and must be excluded.

4. **Constitutional Law: Police Officers and Sheriffs: Search and Seizure: Appeal and Error.** To determine whether an encounter between an officer and a citizen reaches the level of a seizure under the Fourth Amendment to the U.S. Constitution, an appellate court employs the analysis set forth in *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993), which describes the three levels, or tiers, of police-citizen encounters.

5. **Constitutional Law: Police Officers and Sheriffs: Search and Seizure: Arrests.** A tier-one police-citizen encounter involves the voluntary cooperation of the citizen elicited through noncoercive questioning and does not involve any restraint of liberty of the citizen. Because tier-one encounters do not rise to the level of a seizure, they are outside the realm of Fourth Amendment protection. A tier-two police-citizen encounter involves a brief, nonintrusive detention during a frisk for

weapons or preliminary questioning. A tier-three police-citizen encounter constitutes an arrest, which involves a highly intrusive or lengthy search or detention. Tier-two and tier-three police-citizen encounters are seizures sufficient to invoke the protections of the Fourth Amendment to the U.S. Constitution.

6. **Constitutional Law: Search and Seizure.** A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave.

7. \_\_\_\_: \_\_\_\_. In addition to situations where an officer directly tells a suspect that he or she is not free to go, circumstances indicative of a seizure may include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen's person, or the use of language or tone of voice indicating the compliance with the officer's request might be compelled.

8. **Police Officers and Sheriffs: Search and Seizure.** A seizure does not occur simply because a law enforcement officer approaches an individual and asks a few questions or requests permission to search an area, provided the officer does not indicate that compliance with his or her request is required.

9. **Investigative Stops: Motor Vehicles: Time.** A lawful traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of the stop, such as issuing a warning ticket.

10. \_\_\_\_: \_\_\_\_: \_\_\_\_. When the mission of an investigative stop is addressing a suspected traffic violation, the stop may last no longer than is necessary to effectuate that purpose, and authority for the seizure thus ends when tasks tied to the traffic infraction are, or reasonably should have been, completed.

11. **Investigative Stops: Motor Vehicles: Police Officers and Sheriffs.** Although a police officer can inquire into matters unrelated to the justification for a traffic stop if it does not measurably extend the duration of the stop, it is unlawful to prolong a stop beyond the time reasonably required to complete the mission of the stop.

12. **Investigative Stops: Motor Vehicles: Police Officers and Sheriffs: Probable Cause.** A traffic stop can be extended if the officer has a reasonable, articulable suspicion that the motorist is involved in criminal activity unrelated to the traffic violation.

13. **Probable Cause: Words and Phrases.** Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause.

14. **Police Officers and Sheriffs: Probable Cause.** Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances and must be determined on a case-by-case basis.

15. **Probable Cause.** Factors that would independently be consistent with innocent activities may nonetheless amount to reasonable suspicion when considered collectively.

16. **Probable Cause: Police Officers and Sheriffs.** A determination that reasonable suspicion exists need not rule out the possibility of innocent conduct. The inquiry is not whether some circumstances may be susceptible of innocent explanation, but whether, taken together, they suffice to form a particularized and objective basis for the officer to suspect a crime is, or is about to, occur.

17. **Investigative Stops: Motor Vehicles: Police Officers and Sheriffs: Probable Cause.** An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered.

18. **Investigative Stops: Motor Vehicles: Police Officers and Sheriffs.** Although of limited usefulness, nervousness exhibited by a motorist during a traffic stop may be considered along with other factors in determining whether the officer has reasonable suspicion to expand the scope of the detention.

19. **Investigative Stops: Police Officers and Sheriffs: Probable Cause.** If reasonable suspicion exists for a continued detention, the court must consider whether the detention was reasonable in the context of an investigative stop, considering both the length of the continued detention and the investigative methods employed.

20. **Constitutional Law: Miranda Rights: Self-Incrimination.** The safeguards provided by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.

21. **Miranda Rights.** The ultimate inquiry for determining whether a person is in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), is whether there is a formal arrest or restraint on freedom of movement of a degree associated with a formal arrest.

22. **Miranda Rights: Investigative Stops: Motor Vehicles.** Persons temporarily detained pursuant to an investigatory traffic stop are not in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

23. **Miranda Rights: Police Officers and Sheriffs: Investigative Stops: Motor Vehicles.** When a person is detained pursuant to a traffic stop,

there must be some further action or treatment by the police to render the driver in custody and entitled to *Miranda* warnings.

24. **Miranda Rights: Arrests.** It is where a suspect is detained only to an extent analogous to an arrest that *Miranda* warnings are required.

25. **Confessions: Police Officers and Sheriffs: Due Process.** Coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the 14th Amendment.

Appeal from the District Court for Dawson County: James E. Doyle IV, Judge. Affirmed.

Brian W. Copley, of Heldt, McKeone & Copley, for appellant.

Michael T. Hilgers, Attorney General, and Jordan Osborne for appellee.

Pirtle, Chief Judge, and Moore and Riedmann, Judges.

Moore, Judge.

## INTRODUCTION

Alexis M. Murillo-Godoy appeals from his conviction for possession of fentanyl with intent to distribute following a stipulated bench trial in the district court for Dawson County. He asserts that the district court erred in denying his motion to suppress and that he received ineffective assistance of trial counsel. For the reasons stated herein, we affirm.

## STATEMENT OF FACTS

*Charges.*

On December 21, 2021, the State filed an information in the district court charging Murillo-Godoy with possession of fentanyl with intent to distribute in violation of Neb. Rev. Stat. § 28-416(1) (Cum. Supp. 2020), a Class II felony, and possession of drug money in violation of § 28-416(17), a Class IV felony. The State also included a claim pursuant to § 28-416(18), seeking forfeiture of the $2,000 cash found in Murillo-Godoy's possession at the time of his arrest.

*Motion to Suppress and Hearing.*

In January 2022, Murillo-Godoy filed a motion to suppress "any and all evidence, and statements, and the fruits thereof," resulting from the search of his vehicle "because of a search conducted after receiving consent to search through manipulation and deception of another suspect after law enforcement contact should have ended."

A suppression hearing was held before the district court on February 15, 2022. The State called Troy Goodschmidt, a trooper with the Nebraska State Patrol since 2008. Goodschmidt testified about his specialized training in the area of drug interdiction, which included updated information on what law enforcement was seeing nationwide and in certain areas of the country in terms of "any type of contraband smuggling," as well as information on indicators of possible illegal conduct to watch for during vehicle stops, including the type of vehicle, the origin and destination of travel, and the physiology of and emotions exhibited by the people in the vehicle.

Goodschmidt testified about his stop of and the subsequent arrest of Murillo-Godoy. On August 23, 2021, at about 10:55 p.m., Goodschmidt was on duty, patrolling eastbound traffic on Interstate 80 in Dawson County, when he observed a four-door sedan with an inoperable taillight on the driver's side. Goodschmidt began to follow the vehicle, and when he caught up with it, he noticed it was "an older BMW" with a California license plate "with an eight as the first digit." That detail was significant to Goodschmidt because in California, once a vehicle is registered, the plate stays with the vehicle no matter how many times the vehicle is bought or sold. Goodschmidt explained that the plate on a 2008 vehicle should have had "a four or five as the first digit instead of an eight" and that "[e]ight signifies that it has probably been purchased or plated for the first time on that title . . . since mid to late 2020, depending on what the next number is."

When Goodschmidt "ran the tag," he discovered that the vehicle had a salvage title and that it had been titled in June 2021 and registered on July 30, less than a month prior to the stop. According to Goodschmidt, the only time someone can obtain a new license plate in California (for something other than a new vehicle) is when a person brings a vehicle into California from another state or when "it's a California vehicle and they salvage title it." Goodschmidt was aware, based on his training and experience, that drug trafficking organizations utilize salvage titles, which allows them to change the license plates on vehicles, and they will then build "aftermarket compartments" into the vehicle itself. Goodschmidt explained that interdiction officers used to look for "third-party vehicles, meaning the owner is not present in the vehicle," but that drug traffickers have adapted by using salvage titles, which allow for a change to a vehicle's license plates and registration of the vehicle in the name of the person who is going to be using it. Another benefit to using salvage titles is that it "[d]efeats the license plate readers across the country from seeing that plate going back and forth on numerous trips." Goodschmidt acknowledged that not all vehicles with salvage titles are engaged in illegal activity, but he testified that seeing a salvage title "might boost [the likelihood of illegal activity] a little bit" and that it was "something to look for" while making a vehicle stop. He noted that before making the vehicle stop at issue here, he was also aware that the vehicle was registered in Long Beach, California, which he noted was a source area for narcotics.

When Goodschmidt initiated the traffic stop, his vehicle was equipped with a "front-facing camera" that recorded the stop from that vantage point (video recording of dashboard and body camera footage were received into evidence as exhibit 1). Goodschmidt's body camera was charging in his vehicle at the time, so there is no audio of his initial interaction with the driver, whom he identified as Murillo-Godoy. Goodschmidt observed that Murillo-Godoy was visibly

nervous and apparently did not speak English. He noted one suitcase in the backseat and an energy drink and some loose snacks on the passenger side, suggesting to Goodschmidt that Murillo-Godoy was trying to cover as many miles as he could in the shortest amount of time possible. Goodschmidt used his limited Spanish vocabulary to ask where Murillo-Godoy was going, to which he replied, "Atlanta." Murillo-Godoy presented Goodschmidt with a Mexico consular card and a California identification card, along with the vehicle's registration. Murillo-Godoy indicated he had a "translator app" on his phone, so Goodschmidt asked him to bring his phone to Goodschmidt's patrol vehicle where they could speak by using the app.

Murillo-Godoy did not immediately get out of the vehicle when asked to do so by Goodschmidt; instead, he reached into the backseat of the vehicle and opened the suitcase, revealing that there was only clothing inside. He did this without any prompting or inquiry by Goodschmidt as to the contents of the suitcase. According to Goodschmidt, he found this "odd" because motorists do not typically do something like that. Goodschmidt felt Murillo-Godoy was trying to convince him that "there was nothing going on." After displaying the contents of his suitcase, Murillo-Godoy exited his vehicle. He and Goodschmidt then sat in the front seat of the patrol vehicle, where they used the translator app on Murillo-Godoy's phone to communicate. Goodschmidt also placed his body camera on the dashboard (video recording of their interaction from that point includes audio). Goodschmidt did not pat down or handcuff Murillo-Godoy, and he testified that Murillo-Godoy was able to exit the patrol vehicle at any time.

Goodschmidt testified about the significance of Murillo-Godoy's stated travel plans. Goodschmidt noted that Long Beach is in the southern part of California and that to reach Atlanta, Georgia, "in the southern part of the east coast," Murillo-Godoy could have taken a more direct route, driving through Arizona, New Mexico, and Texas, rather than

driving through Nebraska "approximately 300 miles off his route." According to Goodschmidt, drug trafficking organizations will try to avoid more southern routes "because [of] so many hits" and will "move them farther north." When Goodschmidt inquired as to why Murillo-Godoy was going to Atlanta, Murillo-Godoy said that he had lived in California for 6 years, was moving permanently to Atlanta for work, and planned to stay with a relative. They also discussed why Murillo-Godoy did not have a driver's license. Murillo-Godoy told Goodschmidt that he had been trying to get one in California, and they discussed that he would have to start the process again in Georgia. Murillo-Godoy also volunteered that he did not fly to Atlanta because his passport was expired.

Goodschmidt found it "odd" that someone who had lived somewhere for 6 years would have only one suitcase of clothes when moving somewhere else permanently. Goodschmidt felt that Murillo-Godoy's comment about not flying was another attempt to convince him of something and testified that "[n]ormally if somebody is moving and they only have one suitcase, [they'd] fly." Goodschmidt also noted that Murillo-Godoy continued to be "somewhat nervous," fidgeting with his leg and his keys, "mov[ing] them from one spot to the other." According to Goodschmidt, normally, if someone has legitimate travel, their nervousness goes away at some point during their contact with law enforcement.

Goodschmidt advised Murillo-Godoy that he was giving him a warning for the inoperable taillight, and they discussed options for him to get the light fixed. Goodschmidt returned Murillo-Godoy's documents to him, gave him the warning, explained it to him, asked if he had any other questions, and Murillo-Godoy said he did not. According to Goodschmidt, Murillo-Godoy was free to go at this point, although Goodschmidt did not tell him so. Next, Goodschmidt asked Murillo-Godoy if Goodschmidt could talk to him some more, and Murillo-Godoy agreed that they "could have a conversation." Goodschmidt asked if there was anything

illegal in the vehicle, and Murillo-Godoy said there was not. Goodschmidt asked for Murillo-Godoy's consent to search the vehicle, and Murillo-Godoy responded by asking repeatedly why Goodschmidt wanted to do so. While Goodschmidt was explaining why he "had a suspicion," he observed Murillo-Godoy to have "labored breathing." Goodschmidt interpreted Murillo-Godoy's repeated questions as a denial of consent.

At about 11:20 p.m., roughly 25 minutes after the traffic stop, Goodschmidt requested a Dawson County "K-9 unit" and explained to Murillo-Godoy that he was being detained until a "drug dog" could arrive and be deployed. While they waited, Goodschmidt did not initiate conversation and only responded to questions asked by Murillo-Godoy. Shortly before the dog's arrival, Goodschmidt informed Murillo-Godoy that the dog would be there soon, and Murillo-Godoy volunteered that the dog would "hit on it because there was marijuana in the car." At that point, Goodschmidt sought clarification of what had been said, and Murillo-Godoy responded that there was marijuana for personal consumption in a jar on the front driver's-side floorboard by the door. Because Goodschmidt had already requested a drug dog, he told Murillo-Godoy they would continue to wait; the drug dog arrived shortly thereafter.

When a deputy arrived with the drug dog, Goodschmidt explained the situation. Goodschmidt observed the deputy look through the front windshield and driver's-side window of Murillo-Godoy's vehicle, and the deputy told Goodschmidt he could see the jar with the marijuana in it. Goodschmidt then told Murillo-Godoy that they were going to conduct a probable cause search of the vehicle and that he could stand outside or remain inside the patrol vehicle. Goodschmidt and the deputy then began searching Murillo-Godoy's vehicle. The deputy retrieved the jar of marijuana from the front seat floor, as well as a baggie that had "a pipe and some residue in it." When searching the trunk, they located a "coffee pot box" that felt heavier than it should have. When the box was

opened, Goodschmidt and the deputy observed "what appeared to be kilos of narcotics." Goodschmidt testified, based on his training and experience, that the substance, unidentified at that point, was most likely cocaine, fentanyl, or heroin.

Goodschmidt then recontacted Murillo-Godoy and advised him he was under arrest for possession with intent to distribute narcotics. Goodschmidt also requested that a Spanish-speaking officer come to the scene to explain Murillo-Godoy's rights to him in Spanish before speaking with him further. According to Goodschmidt, he did not request an interpreter at the beginning of the traffic stop because at that point, he did not have "enough suspicion to prolong the traffic stop to wait for . . . an interpreter to arrive on the scene." He acknowledged that the translator app was ineffective at times, requiring the repetition and retranslation of some of the communication during the traffic stop.

At the time of Murillo-Godoy's arrest, $2,000 cash was seized from his person. The substance found in the trunk was subsequently confirmed to be fentanyl.

*Ruling on Motion to Suppress.*

On April 1, 2022, the district court entered an order denying Murillo-Godoy's motion to suppress. The court determined that the initial traffic stop of Murillo-Godoy's vehicle due to an inoperable taillight was valid and free from any constitutional deficiency or defect. The court determined that the interaction between Murillo-Godoy and Goodschmidt "remained a first-tier 'police-citizen encounter'" at the point when Goodschmidt returned Murillo-Godoy's documents, Goodschmidt gave Murillo-Godoy the warning ticket, and Murillo-Godoy consented to further questioning. The court found that Goodschmidt's communication with Murillo-Godoy was "pursued through non-coercive questioning, and was casual and not authoritative." The court determined that the first-tier encounter reached its end, becoming a second-tier police-citizen encounter when Goodschmidt asked

Murillo-Godoy if he could search the vehicle, Murillo-Godoy did not consent, and Goodschmidt told Murillo-Godoy he was detained while they waited for a drug dog to arrive.

The district court noted the specific, articulable facts supporting Goodschmidt's reasonable suspicions that Murillo-Godoy had committed or was committing a crime, including (1) the fact that Murillo-Godoy did not have a driver's license and his unusual explanation for why he did not; (2) the vehicle's salvage title and its registration to Murillo-Godoy only a few months prior to the traffic stop; (2) Murillo-Godoy's indirect route from Long Beach to Atlanta; (4) the fact that his travel originated in a drug source city; (5) Murillo-Godoy's moving across the country with only one suitcase, despite having lived in California for 6 years; (6) Murillo-Godoy's opening his suitcase to display its contents without being asked, possibly intending to distract or "put off" questions; and (7) Goodschmidt's observations of Murillo-Godoy's nervousness during the stop.

In evaluating the totality of these circumstances, the district court observed that the analysis did not permit it to discount or rule out innocent explanations for suspicious facts and thus view such factors in isolation. The court concluded that the facts established a "sufficient and constitutionally valid justification" for Goodschmidt to detain Murillo-Godoy and wait for a drug dog. The court noted that several of the articulated suspicions, such as the origin of Murillo-Godoy's travel, in isolation, may not be considered suspicious. The court reasoned, however, that when all of the factors and the inferences and deductions from those factors made by an experienced officer with specialized training were considered in totality, they justified the detention of Murillo-Godoy. Accordingly, the court concluded that Murillo-Godoy's detention was constitutionally valid and did not transgress his constitutional rights.

Finally, the district court addressed the issue of probable cause to search Murillo-Godoy's vehicle. The court

determined that Murillo-Godoy's disclosure that he had marijuana in the vehicle, without any prompting by Goodschmidt, provided Goodschmidt with probable cause for the search. The court also addressed the amount of time between the initial stop and the arrival of the drug dog (44 minutes per the court's calculation, but closer to 47 minutes based on a review of the body camera footage) and found that the wait was not unreasonable for Fourth Amendment purposes.

*Stipulated Bench Trial.*

A stipulated bench trial was held before the district court on July 8, 2022. The State dismissed the possession of drug money count during the course of the bench trial, and Murillo-Godoy renewed his motion to suppress, which the court again denied. The court also received the parties' joint stipulation of undisputed facts. The parties stipulated that Murillo-Godoy was operating a vehicle and was stopped by Goodschmidt on August 23, 2021. They also stipulated that when his vehicle was searched, officers found a box with "five kilo bricks" of a suspected controlled substance, weighing a total of about 5.2 kilograms, including the packaging, and that when tested at the Nebraska State Patrol Crime Laboratory, the substance was confirmed to be fentanyl, a Schedule II controlled substance. Finally, they stipulated that officers found $2,000 cash in Murillo-Godoy's left front pocket during the arrest, and the stipulation noted Murillo-Godoy's prior motion to suppress and his renewal of that motion.

*Verdict and Sentencing.*

On October 5, 2022, the district court entered an order denying Murillo-Godoy's renewed motion to suppress for the reasons specified in its April 2022 order and finding Murillo-Godoy guilty of possession of fentanyl with intent to distribute. The court also ordered a presentence investigation and scheduled a sentencing hearing.

On December 6, 2022, the district court entered an order sentencing Murillo-Godoy to a term of 10 to 18 years'

imprisonment, with 468 days' credit for time already served. The court also ordered the forfeiture of the $2,000 found in Murillo-Godoy's possession at the time of his arrest.

## ASSIGNMENTS OF ERROR

Murillo-Godoy assigns that (1) the district court erred in overruling his motion to suppress evidence because Goodschmidt lacked reasonable suspicion to detain him, (2) the court erred in overruling his motion to suppress because Goodschmidt lacked probable cause to search the vehicle, and (3) he was "denied the right to the effective assistance of counsel pursuant to the Sixth Amendment [to] the United States Constitution and Article I, Section 11 of the Nebraska Constitution."

Murillo-Godoy's third assignment of error fails to specifically allege any deficient performance by his trial counsel. Assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance, and an appellate court will not scour the remainder of the brief in search of such specificity. *State v. Applehans*, 314 Neb. 653, 992 N.W.2d 464 (2023). In his reply brief, Murillo-Godoy urges us to consider his last assigned error, arguing that his assertion of deficient performance was set forth with the requisite specificity in the summary of argument section of his initial brief. The Nebraska Supreme Court has repeatedly made clear that the requisite specificity must be found in the assignment of error itself. Accordingly, we do not address Murillo-Godoy's third assignment of error.

## STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Elias*, 314 Neb. 494, 990 N.W.2d 905 (2023). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that

an appellate court reviews independently of the trial court's determination. *Id.*

## ANALYSIS

Murillo-Godoy assigns that the district court erred in overruling his motion to suppress evidence because Goodschmidt lacked reasonable suspicion to detain him and lacked probable cause to search the vehicle. He acknowledges that the initial stop of his vehicle was proper, but he argues that the stop was improperly extended beyond the scope of the traffic violation because Goodschmidt did not have reasonable suspicion to do so. Murillo-Godoy argues further that his admission that there was marijuana in the vehicle was obtained during a custodial interrogation in violation of his *Miranda* rights and that thus, Goodschmidt lacked probable cause to search the vehicle.

*Relevant Propositions Concerning*
*Police-Citizen Encounters.*

[2,3] Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. *State v. Samuels*, 31 Neb. App. 918, 991 N.W.2d 900 (2023). Evidence obtained as the fruit of an illegal search or seizure is inadmissible in a state prosecution and must be excluded. *Id.*

[4,5] To determine whether an encounter between an officer and a citizen reaches the level of a seizure under the Fourth Amendment to the U.S. Constitution, an appellate court employs the analysis set forth in *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993), which describes the three levels, or tiers, of police-citizen encounters. *State v. Samuels, supra*. A tier-one police-citizen encounter involves the voluntary cooperation of the citizen elicited through noncoercive questioning and does not involve any restraint of liberty of the citizen. *Id.* Because tier-one encounters do not rise to the level of a seizure, they are outside the realm of Fourth Amendment protection. *State v. Samuels, supra*. A tier-two police-citizen encounter involves a brief, nonintrusive

detention during a frisk for weapons or preliminary questioning. *Id.* A tier-three police-citizen encounter constitutes an arrest, which involves a highly intrusive or lengthy search or detention. *Id.* Tier-two and tier-three police-citizen encounters are seizures sufficient to invoke the protections of the Fourth Amendment to the U.S. Constitution. *State v. Samuels, supra*.

[6-8] A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave. *State v. Samuels, supra*. In addition to situations where an officer directly tells a suspect that he or she is not free to go, circumstances indicative of a seizure may include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen's person, or the use of language or tone of voice indicating the compliance with the officer's request might be compelled. *Id.* A seizure does not occur simply because a law enforcement officer approaches an individual and asks a few questions or requests permission to search an area, provided the officer does not indicate that compliance with his or her request is required. *Id.*

*Initial Traffic Stop and Investigation.*

In this case, the evidence shows that Murillo-Godoy was stopped because his vehicle had an inoperable taillight, and he does not challenge the lawfulness of the initial traffic stop and resulting investigation. See *State v. Thompson*, 30 Neb. App. 135, 966 N.W.2d 872 (2021) (traffic violation, no matter how minor, creates probable cause to stop driver of vehicle). See, also, Neb. Rev. Stat. § 60-6,219 (Reissue 2021) (setting forth requirements for motor vehicle lights); *State v. Burns*, 16 Neb. App. 630, 747 N.W.2d 635 (2008) (where vehicle is equipped with two taillights, § 60-6,219(6) requires both taillights to give substantially normal light output and to show red directly to rear). The traffic stop resulted in a tier-two seizure sufficient to invoke the protections of the Fourth

Amendment. See *State v. Hartzell*, 304 Neb. 82, 933 N.W.2d 441 (2019).

After stopping Murillo-Godoy's vehicle, Goodschmidt conducted an investigation reasonably related in scope to the circumstances justifying the stop. See *State v. Barbeau*, 301 Neb. 293, 917 N.W.2d 913 (2018) (once vehicle is lawfully stopped, law enforcement officer may conduct investigation reasonably related in scope to circumstances that justified traffic stop). Goodschmidt provided Murillo-Godoy with a warning ticket and returned his documents to him, explained the ticket, and told Murillo-Godoy he only needed to fix the broken taillight. He asked if Murillo-Godoy had any questions, and Murillo-Godoy said he did not. Goodschmidt then asked if he could ask Murillo-Godoy some more questions, and Murillo-Godoy consented to further conversation. Upon Goodschmidt's inquiry, Murillo-Godoy denied having anything illegal in the vehicle and, rather than responding directly to Goodschmidt's request to search the vehicle, began asking why Goodschmidt wanted to make a search. The conversation continued until Goodschmidt stated that it was his belief there were illegal substances in the vehicle and that Murillo-Godoy was being detained until a drug dog could arrive. While they were waiting for the dog's arrival, Murillo-Godoy volunteered that there was marijuana in the vehicle and confirmed to Goodschmidt that it was for personal use.

In its order ruling on Murillo-Godoy's motion to suppress, the district court characterized the entire encounter as being a tier-one police-citizen encounter up until the point when Goodschmidt asked Murillo-Godoy if he could search the vehicle and Murillo-Godoy did not provide consent. A more accurate assessment of the encounter is that the seizure resulting from the traffic stop ended at the point when Goodschmidt issued and explained the warning ticket, returned Murillo-Godoy's documents, and ensured Murillo-Godoy had no further questions. A new consensual encounter began at the point when Murillo-Godoy agreed to speak further with

Goodschmidt. The district court found that this consensual encounter ended when Goodschmidt asked for consent to search the vehicle. We agree. The question then becomes whether reasonable suspicion existed to extend the stop following Murillo-Godoy's refusal to the request to search.

*Reasonable Suspicion to Extend Stop.*

[9-11] The question raised by Murillo-Godoy's first assignment of error is whether Goodschmidt had a reasonable, articulable suspicion to extend the investigative stop. A lawful traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of the stop, such as issuing a warning ticket. *State v. Thompson*, 30 Neb. App. 135, 966 N.W.2d 872 (2021). When the mission of an investigative stop is addressing a suspected traffic violation, the stop may last no longer than is necessary to effectuate that purpose, and authority for the seizure thus ends when tasks tied to the traffic infraction are, or reasonably should have been, completed. *Id.* Although a police officer can inquire into matters unrelated to the justification for a traffic stop if it does not measurably extend the duration of the stop, it is unlawful to prolong a stop beyond the time reasonably required to complete the mission of the stop. *State v. Samuels*, 31 Neb. App. 918, 991 N.W.2d 900 (2023).

[12-15] A traffic stop can be extended if the officer has a reasonable, articulable suspicion that the motorist is involved in criminal activity unrelated to the traffic violation. *Id.* Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause. *Id.* Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances and must be determined on a case-by-case basis. *State v. Lowman*, 308 Neb. 482, 954 N.W.2d 905 (2021). We also note that factors that would independently be consistent with innocent

activities may nonetheless amount to reasonable suspicion when considered collectively. *State v. Samuels, supra*.

[16,17] A determination that reasonable suspicion exists need not rule out the possibility of innocent conduct. *State v. Barbeau*, 301 Neb. 293, 917 N.W.2d 913 (2018). The inquiry is not whether some circumstances may be susceptible of innocent explanation, but whether, taken together, they suffice to form a particularized and objective basis for the officer to suspect a crime is, or is about to, occur. *Id.* Additionally, an officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered. *State v. Samuels, supra*.

In this case, the district court noted the factors over the course of Goodschmidt's encounter with Murillo-Godoy that raised his suspicions that Murillo-Godoy was engaged in criminal activity: (1) Murillo-Godoy did not have a driver's license and provided an unusual explanation for why he did not, (2) the vehicle had a salvage title and had been titled and registered only a few months prior to the stop, (3) Murillo-Godoy was taking an indirect route from Long Beach to Atlanta, (4) Long Beach was a drug source city, (5) Murillo-Godoy had lived in Long Beach for 6 years but was moving to Atlanta with only one suitcase, (6) Murillo-Godoy displayed the contents of his suitcase to Goodschmidt unprompted, and (7) Goodschmidt's observations of Murillo-Godoy's nervousness.

Murillo-Godoy argues that every fact considered by Goodschmidt is innocent in nature. He notes that Goodschmidt did not find any prior criminal history for him and that there were no inconsistent explanations for his travel given by a passenger in the vehicle. He contends that Goodschmidt's interpretation of the circumstances was colored by the language barrier between them. While some of the factors relied on by Goodschmidt would independently be consistent with innocent activities, we agree with the district court that

when considered collectively, the totality of the circumstances provided a reasonable, articulable suspicion to extend the traffic stop.

Goodschmidt relied on factors that included Murillo-Godoy's indirect route from California to Georgia and the origin of his travel in a drug source city. Murillo-Godoy notes that travel plans described as somewhat unconventional may not necessarily be indicative of criminal activity. See *State v. McGinnis*, 8 Neb. App. 1014, 608 N.W.2d 605 (2000) (unusual or suspicious travel plans may not always give rise to reasonable suspicion). This is true, but when travel plans seem unusual and are not reasonably explained, such circumstances may give rise to reasonable suspicion. *State v. Yang*, 28 Neb. App. 447, 945 N.W.2d 206 (2020). See *State v. Howard*, 282 Neb. 352, 803 N.W.2d 450 (2011) (unusual length, nature, expense, and duration of trip weighed heavily in favor of finding reasonable suspicion). Additionally, this court has noted that while the Eighth Circuit has found travel originating in a location known for drug activity to be of limited value in determining reasonable suspicion, such a circumstance can contribute to a finding of reasonable suspicion where there are other existing suspicious factors of criminal activity. See *State v. Yang, supra*. See, also, *U.S. v. Beck*, 140 F.3d 1129 (8th Cir. 1998).

[18] We agree that certain factors relied on by Goodschmidt, when viewed in isolation, may not be considered suspicious. Certainly, cost considerations could explain an individual's decision to drive rather than fly when moving across the country, and various personal circumstances might lead to a person's moving permanently from one state to another with only a single suitcase of clothing. And, although of limited usefulness, nervousness exhibited by a motorist during a traffic stop may be considered along with other factors in determining whether the officer has reasonable suspicion to expand the scope of the detention. *State v. Verling*, 269 Neb. 610, 694 N.W.2d 632 (2005).

Other factors considered by Goodschmidt included Murillo-Godoy's lack of a driver's license, the vehicle's salvage title and recent titling and registration, and Murillo-Godoy's apparent efforts to distract him from possible criminal activity, including voluntarily opening his suitcase and displaying its contents. Murillo-Godoy was traveling from a drug source city in California to Georgia by way of Nebraska, a lengthy and indirect route, especially for someone driving without a license. Goodschmidt had extensive training in drug and contraband interdiction, and he was aware of the use of salvage-titled vehicles and less-southerly travel routes by drug trafficking organizations. When these factors, and those discussed above, are considered in their totality, they established a reasonable, articulable suspicion for Goodschmidt to extend the traffic stop to wait for a drug dog to arrive. The district court did not err in denying Murillo-Godoy's motion to suppress on this basis.

[19] For the sake of completeness, we note that if reasonable suspicion exists for a continued detention, the court must consider whether the detention was reasonable in the context of an investigative stop, considering both the length of the continued detention and the investigative methods employed. *State v. Yang, supra*. Murillo-Godoy does not challenge the district court's determination that the duration of the investigatory stop (lasting less than 50 minutes) was not unreasonable for purposes of the Fourth Amendment, and we find no error in this regard. See *State v. Drake*, 311 Neb. 219, 971 N.W.2d 759 (2022) (discussing reasonableness of duration periods of various investigatory stops while waiting for drug dog).

*Probable Cause to Search.*

Murillo-Godoy assigns that the district court erred in overruling his motion to suppress because Goodschmidt lacked probable cause to search the vehicle. The court found that Murillo-Godoy's disclosure that he had marijuana in

the vehicle, made without any prompting or inquiry by Goodschmidt, while they were waiting for the drug dog to arrive, provided probable cause to conduct a search of Murillo-Godoy's vehicle. See *State v. Landis*, 281 Neb. 139, 794 N.W.2d 151 (2011) (finding defendant's confession to marijuana possession while seated in state trooper's cruiser during investigatory stop was voluntary and thus comported with due process, absent indication that trooper used force or threats to get defendant to enter cruiser or to remain there).

Ignoring his initial voluntary statement that there was marijuana in his vehicle, Murillo-Godoy relies on his second statement about the presence of marijuana for personal use in the vehicle following the clarifying question asked by Goodschmidt. He argues that Goodschmidt lacked probable cause to search his vehicle because Goodschmidt conducted a custodial interrogation in violation of Murillo-Godoy's *Miranda* rights.

[20-22] The safeguards provided by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. *State v. Johnson*, 308 Neb. 331, 953 N.W.2d 772 (2021). The ultimate inquiry for determining whether a person is in custody for purposes of *Miranda* is whether there is a formal arrest or restraint on freedom of movement of a degree associated with a formal arrest. *State v. Benson*, 305 Neb. 949, 943 N.W.2d 426 (2020). Persons temporarily detained pursuant to an investigatory traffic stop are not in custody for purposes of *Miranda*. *State v. Khalil*, 25 Neb. App. 449, 908 N.W.2d 97 (2018).

[23-25] When a person is detained pursuant to a traffic stop, there must be some further action or treatment by the police to render the driver in custody and entitled to *Miranda* warnings. *State v. Khalil, supra*. It is where a suspect is detained only to an extent analogous to an arrest that *Miranda* warnings are required. *State v. Landis, supra*. Coercive police

activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the 14th Amendment. *State v. Landis, supra.*

Here, Murillo-Godoy was temporarily detained pursuant to a traffic stop and voluntarily entered Goodschmidt's patrol vehicle while Goodschmidt prepared the warning ticket. We have already determined that Goodschmidt had reasonable, articulable suspicions sufficient to extend the stop to wait for a drug dog. Some further action or treatment by Goodschmidt that would raise Murillo-Godoy's detention to an extent analogous to an arrest was required to render him in custody. Because there was none, Murillo-Godoy was not "in custody" for *Miranda* purposes, and *Miranda* warnings were not required before he could be questioned.

The district court determined that Murillo-Godoy voluntarily stated he had marijuana in his vehicle. The court found no evidence of any prior action on the part of Goodschmidt that was or could be construed to be coercive or exerting an effort to overcome Murillo-Godoy's free will. The court noted that Murillo-Godoy was never restrained in the patrol vehicle and that he was not handcuffed until after the search revealed the presence of drugs in the trunk of his vehicle. The court found no evidence of any force, coercion, compulsion, or other effort to compel Murillo-Godoy to remain in the patrol vehicle to answer questions from Goodschmidt, to wait for the drug dog, or to make the statement about the presence of marijuana in his vehicle. The court concluded that Murillo-Godoy's presence in the patrol vehicle during the questioning and his statement about the marijuana were voluntary and the product of his free will. This is consistent with our review of the record.

Because the record does not show that Murillo-Godoy was in custody for *Miranda* purposes while seated in Goodschmidt's patrol vehicle while waiting for the drug dog, we need not address whether he was subjected to an interrogation during that time. Accordingly, any statements he made

to Goodschmidt while seated in the patrol vehicle were not obtained in violation of his Fifth Amendment rights. Murillo-Godoy's voluntary statement about the presence of marijuana in his vehicle provided Goodschmidt with probable cause to search Murillo-Godoy's vehicle. See *State v. Landis*, 281 Neb. 139, 794 N.W.2d 151 (2011). The district court did not err in denying Murillo-Godoy's motion to suppress on this basis.

## CONCLUSION

Having considered and rejected Murillo-Godoy's assigned errors, we affirm his conviction and sentence.

Affirmed.